EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Wanda Colón Cortés, por sí y como representante de las Comunidades Opuestas a la Ruta 66<br>        Peticionarios<br><br>        v.<br><br>Carlos I. Pesquera, Presidente de la Autoridad de Carreteras y Transportación<br>        Recurridos | Certiorari<br><br>2000 TSPR 60 |

Número del Caso:  CC-1999-0666

Fecha: 19/04/2000

Tribunal de Circuito de Apelaciones: Circuito Regional I

Juez Ponente: Hon. Ortiz Carrión

Abogados de la Parte Peticionaria:
                Lcda. Jessica Rodríguez Martín

Abogada de la Junta de Calidad Ambiental:
                Lcda. Jeniffer Mayo

Abogados de la Autoridad de Carreteras:
                Lcdo. Luis A. Rivera Cabrera
                Lcdo. Raúl Castellanos Malavé
                Lcdo. Melvin Maldonado

Oficina del Procurador General:
                Lcdo. Gustavo A. Gelpí,
                Procurador General

        Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wanda Colón Cortés, por sí y
como representante de las
**Comunidades Opuestas a la**
Ruta 66

     Peticionarios

        v.                    CC-1999-666

Carlos I. Pesquera, Presidente
de la Autoridad de Carreteras
y Transportación

     Recurridos

En cuanto a los acápites I y II, la Juez Asociada señora NAVEIRA DE RODÓ emitió la Opinión del Tribunal con la cual estuvieron conformes el Jue Presidente señor Andréu García y los Jueces Asociados señores Hernánde Denton y Fuster Berlingeri. En cuanto al acápite III, estuvieron conforme el Juez Presidente señor Andréu García, la Juez Asociada señora Naveira d Rodón y el Juez Asociado señor Hernández Denton. El Juez Asociado seño Fuster Berlingeri concurrió con el resultado.

San Juan, Puerto Rico a 19 de abril de 2000

El presente caso surge como secuela de la Opinión emitida por este Tribunal en <u>Colón Cortés y otros</u> v. <u>J.C.A.</u>, res. el 2 de junio de 1999, 99 T.S.P.R. 85, 148 D.P.R.___ (1999) (en adelante <u>Colón Cortés I</u>). A continuación resumimos los hechos pertinentes y la complicada trayectoria procesal que lo devuelve ante nuestra consideración.

**I.**

En 1992, la Autoridad de Carreteras y Transportación de Puerto Rico (en adelante ACT) comenzó un procedimiento de Declaración de Impacto Ambiental para el proyecto vial comúnmente conocido como la "Ruta 66" (en adelante la Ruta). La Declaración de Impacto Ambiental Preliminar (en adelante DIA-P) circulada por la ACT describía el proyecto como "la construcción de un expreso de acceso controlado, con una extensión aproximada de 24.3 kilómetros, a **través de los municipios**

de **San Juan, Trujillo Alto, Carolina y Canóvanas**." Además, el documento contemplaba la posibilidad de extender la vía hasta **Fajardo**. Según la ACT, el objetivo primordial de la Ruta era **unir los pueblos del Este de Puerto Rico con el Area Metropolitana de San Juan (AMSJ)**. La DIA-P enfatizaba la importancia de la vía para el desarrollo económico del Este, para descongestionar el tránsito en la carretera PR-3 (conocida como la Avenida Regimiento 65 de Infantería) y para reducir el tiempo de viaje a algunas de las atracciones turísticas más importantes del país.

Como parte del proceso de evaluación ambiental, la Junta de Calidad Ambiental (en adelante JCA) informó al público sobre la disponibilidad de la DIA-P y designó un panel examinador para que celebrara vistas al respecto. Luego de considerar tanto la DIA-P sometida por la ACT, como los comentarios recibidos del público y agencias consultadas, el panel rindió un primer informe el 29 de diciembre de 1992. El informe incluyó un análisis detallado de las deficiencias del documento y **concluyó que el mismo carecía "de información de vital importancia y necesaria para poder realizar una evaluación adecuada de la acción propuesta**." El panel determinó que la información contenida en la DIA-P debía ser ampliada en diversas materias.

El 13 de mayo de 1993 se sometió una versión abreviada del informe del panel examinador a la Junta de Gobierno de la JCA. El 15 de mayo la JCA emitió una resolución mediante la cual **aprobó dicha versión del informe "en todas sus partes"** y lo hizo formar parte de la resolución. **El informe adoptado consideraba necesario que la ACT suplementara la DIA-P mediante un "Addendum" donde se discutieran una docena de señalamientos**. Cabe destacar que la Sec. 2.1(c) del Reglamento sobre Declaraciones de Impacto Ambiental de la Junta de Calidad Ambiental, Reglamento Núm. 3106 de junio de 1984 (en adelante el Reglamento) dispone que un Addendum es un "[d]ocumento que preparará la agencia donde se incluya información adicional solicitada al proponente, **debido**

**a deficiencias encontradas que sean de tal magnitud que deberían revisarse y comentarse antes de solicitarse la DIA Final**." (Énfasis suplido.)

Entre los señalamientos del panel examinador que la ACT tenía que atender mediante un suplemento a la DIA-P destacan:

1. La **discusión de alternativas** a la Ruta, ya que las contenidas en la DIA-P no cumplían con lo dispuesto en el Reglamento. Al contraponer la necesidad del proyecto expresada por la agencia con las posibles alternativas presentadas por los deponentes en las vistas, el panel determinó que era necesario una discusión más profunda de las alternativas al proyecto. La Sec. 5.3.7 del Reglamento exige que en dicha discusión se considere toda alternativa razonable y se haga un **análisis comparado del impacto ambiental** de éstas. El único análisis comparado que se hizo en la discusión de alternativas a la Ruta fue uno de costo monetario.[1]

2. La DIA-P no identificó las áreas residenciales que se afectarían por **contaminación sónica** que no pueda mitigarse construyendo barreras.

---

[1] La Sec. 5.3.7 del Reglamento dispone el alcance que debe tener la discusión de alternativas:

**Deberá presentarse, a manera de comparación, el impacto ambiental de la acción propuesta y de sus alternativas**, de manera que se precisen las cuestiones bajo evaluación y se provean alternativas de selección para los funcionarios y el público. Las agencias deberán:

a. Objetivamente considerar y evaluar toda alternativa razonable, y exponer en forma concisa las razones para excluir a que las alternativas que sean eliminadas de [la] evaluación detallada.
b. Dar consideración substancial a cada alternativa evaluada en forma detallada, incluyendo la acción propuesta, de manera que las personas que utilicen la DIA puedan evaluar lo méritos de cada alternativa.
c. Incluir alternativas razonables que no estén dentro de la programación de la agencia proponente, a tenor con los planes de desarrollo de la región.
d. Incluir la alternativa de no llevar a cabo la acción propuesta.
e. Identificar la alternativa preferida por la agencia proponente en la DIA Preliminar.
Incluir las medidas de mitigación de efectos adversos al ambiente no discutidas en la acción o en las alternativas propuestas. (Énfasis suplido.)

3. La **discusión del impacto geológico e hidráulico en la DIA-P era muy vaga y superficial**. La DIA-P se limitó a decir que los estudios pertinentes se efectuarían. No se identificaron las áreas a través de la Ruta que se consideraban más propensas a erosión, sedimentación y a deslizamientos. En cuanto a la erosión no se explicó cómo iba a ser controlada. **Esta omisión resulta preocupante en vista que el informe del panel enfatizó que la construcción de una carretera aumentaba tanto el volumen de escorrentía como la probabilidad de inundaciones y derrumbes**. Ello, debido a que los pavimentos de hormigón y asfalto y la compactación mecánica del terreno incrementarían el área impermeable.

4. La DIA-P no discutía el **impacto de las presiones de desarrollos** que se crearían a lo largo de la Ruta como impactos al ambiente socioeconómico.

5. La DIA-P hacía referencia a una serie de **estudios científicos a realizarse en un futuro**. El panel entendía que era necesario efectuar dichos estudios antes de poder evaluar el impacto real de proyecto.

6. Debido a que en la DIA-P se expresó la **posibilidad** de extender la Ruta de Canóvanas hasta Fajardo, el panel señaló que **se debía discutir el impacto ambiental acumulativo de todas las etapas del proyecto propuesto**, según lo dispone la reglamentación vigente.

En febrero de 1996, después de tres (3) años del panel examinador haber rendido su informe inicial, la ACT presentó un "Addendum" a la Declaración de Impacto Ambiental (en lo sucesivo suplemento). A pesar de haber tardado tanto tiempo en preparar dicho suplemento, en él la ACT sólo se limitó a evaluar el tramo de Carolina a Canóvanas. Con este cambio, el suplemento pretendía subsanar las deficiencias señaladas por el panel en el informe **adoptado por la Junta de Gobierno de la JCA**. Lejos de atender los requerimientos específicos señalados en los informes antes mencionados, la ACT simplemente eliminó de la propuesta los tramos más polémicos de la Ruta: el tramo de Río Piedras

a Carolina, que discurría en parte por terrenos de la Estación Experimental de la Universidad de Puerto Rico (Jardín Botánico) y el segmento de Canóvanas a Río Grande, que pasaba por las cercanías del Yunque. Además, el suplemento añadía un corto tramo para conectar la Ruta con la Avenida Regimiento 65 de Infantería que discurre paralelamente a la vía propuesta. Véase Exhibit 1.

A pesar del aparente cambio conceptual, el Addendum **aún identificaba como objetivo primordial del proyecto el proveer a los usuarios que transitan entre el AMSJ y el área Este de la Isla una vía de tránsito alterna tipo expreso de acceso controlado por peajes**. Ello, no obstante que el segmento evaluado en el suplemento sólo conecta a un municipio con otro contiguo. Es decir, une a Carolina con Canóvanas, que es el pueblo vecino inmediato.

El suplemento describe la nueva trayectoria de la siguiente forma: "La acción propuesta en este documento consiste de una vía expreso con longitud aproximada de 16 kilómetros (10 millas), **comenzando en el Municipio de Carolina a la Altura de Plaza Carolina y finalizando en Canóvanas...**" (en adelante ruta acortada). Véase Exhibit 2. Señala que la Ruta se ha "acortado" para reducir el potencial de impacto en los recursos físicos y naturales del área circundante. **Sin embargo, el propio documento reconoce la posibilidad de "fases posteriores", particularmente la extensión de Canóvanas a Río Grande, y deja en "suspenso" el tramo de Río Piedras a Carolina**. Además, resulta significativo que el suplemento se refiere en todo momento a la ruta acortada como el "tramo" o el "segmento" de Carolina a Canóvanas, o sea, como parte de un todo más largo. Refuerza esta interpretación el hecho que el 24 de junio de 1998, la Junta de Planificación emitió una resolución mediante la cual aprobó la extensión de la ruta acortada desde Canóvanas hasta Río Grande.

El 24 de mayo de 1996, Wanda Colón Cortés y las Comunidades Opuestas a la Ruta 66 (en adelante las Comunidades), presentaron una moción ante la JCA solicitando la preparación de una nueva DIA.

Arguyeron que la ACT ignoró los requerimientos del panel examinador y en vez de un Addendum presentó un suplemento que proponía un proyecto distinto al que se describía en la DIA-P. La JCA emitió resolución acogiendo bajo estudio la moción y celebró vistas públicas sobre el suplemento el 27 de junio de 1996. La ACT presentó moción oponiéndose a la solicitud de nueva DIA.

El 29 de mayo de 1997, la JCA comunicó mediante carta dirigida exclusivamente a la ACT, que entendían que **al acortar el proyecto**, el suplemento había cumplido con el Art. 4(c) de la Ley Sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970, según enmendada, 12 L.P.R.A. sec. 1121 et seq. **Ésta decisión fue fundamentada en que la ruta acortada debía evaluarse de forma independiente a cualquier otro tramo que conectara con ella**. Ello, contrario a lo dispuesto en el informe del panel examinador que fuera adoptado anteriormente por la propia JCA a los efectos de exigir que se evaluara el impacto ambiental acumulativo de la totalidad de las etapas del proyecto.

Las Comunidades, al enterarse por medio de la prensa de la carta enviada a la ACT, decidieron impugnar tanto la suficiencia del suplemento, como su "aprobación" por parte de la JCA para publicarlo como Declaración de Impacto Ambiental Final (en adelante DIA Final). Estas acudieron en revisión al Tribunal de Circuito de Apelaciones (en adelante Tribunal de Circuito), quien desestimó el recurso por prematuro. Fundamentó su dictamen en que no existía decisión final de la JCA debidamente notificada de la cual recurrir.

Inconformes con la desestimación, las Comunidades presentaron una petición de certiorari ante nos. En aquel momento declinamos revisar.

Así las cosas, la ACT publicó un aviso en la prensa en el que informó la disponibilidad de DIA Final. A raíz de ello, las Comunidades volvieron a pedir revisión ante el Tribunal de Circuito. En síntesis, cuestionaron la conformidad de las DIA-P y suplemento del proyecto con la Ley sobre Política Pública Ambiental y la reglamentación ambiental complementaria. Alegaron que la JCA nunca

resolvió su solicitud para que se preparara una nueva DIA mediante resolución debidamente notificada. La JCA y la ACT presentaron una solicitud de desestimación, la cual fue denegada por el foro apelativo. Inconformes, tanto la JCA como la ACT acudieron ante nos. Luego de examinar los planteamientos de las partes, expedimos el auto y emitimos nuestra Opinión en Colón Cortés I, predecesor del presente caso.

En lo pertinente a las controversias ante nuestra consideración, en Colón Cortés I resolvimos que el suplemento presentado por la ACT no corrigió las deficiencias a la DIA-P señaladas por el panel examinador. **Hicimos especial énfasis en que se ignoró el requerimiento del panel examinador de producir una DIA para la totalidad de la Ruta.** También señalamos que el suplemento debió profundizar en el análisis de alternativas a la Ruta y que tenía que incluir un estudio del impacto ambiental secundario que resultaría de las presiones de desarrollo a lo largo de la vía. Finalmente, señalamos la ilegalidad de lo construido hasta entonces por carecer la ACT de una DIA Final válidamente aprobada.

A raíz de nuestro dictamen, el 7 de junio de 1999, la ACT, sin haber hecho acto afirmativo alguno para corregir las deficiencias que le habíamos indicado, acudió a la JCA y le solicitó que emitiera una resolución formal resolviendo la moción de las Comunidades para que se preparara una nueva DIA. El 14 de junio de 1999 la JCA emitió la Resolución 99-21-1. En ella, simultáneamente: (i) rechazaba la solicitud para que la ACT preparara una nueva DIA; (ii) daba por terminado el proceso de vistas públicas; (iii) "aprobaba" el cumplimiento de las DIA-P y suplemento con la Ley sobre Política Pública Ambiental, "autorizándolas" como DIA Final; y (4) "permitía" a la ACT publicar un aviso sobre disponibilidad de DIA Final.

**En resumen, en menos de una semana la JCA dio por terminado el proceso de consultas públicas y de evaluación ambiental que este Tribunal había declarado crasamente deficiente. Ello, a pesar de que**

**la ACT no realizó acto afirmativo alguno para cumplir con los señalamientos de índole sustantivo que hiciéramos en Colón Cortés I**.

Posteriormente, el 16 de junio de 1999, las Comunidades presentaron ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una petición de *mandamus* al amparo del Art. 20 de la Ley sobre Política Pública Ambiental dirigida contra la ACT. El recurso perseguía obligar **directamente a la ACT** a cumplir tanto con lo establecido por este Tribunal en Colón Cortés I, como con lo dispuesto por el panel examinador en su informe según las exigencias de la legislación y reglamentación ambiental. Las Comunidades, además, solicitaron una orden inmediata para que la ACT cumpliera con su deber ministerial de no construir hasta tanto no se emitiera una DIA Final **para la totalidad de la Ruta 66 que se ajustara a la reglamentación ambiental vigente.**

El fin del recurso no era que se revisara la Resolución 99-21-1 de la JCA en sus méritos. Lo que pedían las Comunidades era que la ACT, como agencia proponente, cumpliera con los deberes que le impone directamente la Constitución, la Ley sobre Política Pública Ambiental y la reglamentación complementaria aprobada a su amparo. Las Comunidades sostuvieron que **en vez de corregir las deficiencias de la DIA-P señaladas por el panel examinador de la JCA y avaladas por este Tribunal, la ACT simplemente presentó un suplemento que eliminó del proyecto los tramos más controversiales**. Alegaron que esto se hizo para evadir el análisis ambiental de los efectos acumulativos exigido por la ley. Denunciaron que, en vez de ejercer su función fiscalizadora, la JCA produjo una resolución pro forma con el propósito de relevar a la ACT de su deber de producir una evaluación ambiental adecuada antes de comenzar a implantar el proyecto.[2]

---

[2] Las Comunidades sostuvieron, además, que la resolución de la JCA era *nula ab initio* por haber ratificado lo que este Tribunal declaró ilegal en Colón Cortés, sin haberse remediado las deficiencias en el proceso ambiental señaladas en la Opinión.

Tras escuchar a todas las partes en la vista oral celebrada el 25 de junio de 1999, el Tribunal de Primera Instancia, por voz de la Hon. Carmen Rita Vélez Borrás, dictó sentencia declarando con lugar la demanda de *mandamus* y ordenándole a la ACT y a su presidente cumplir "con el deber ministerial de obtener una Declaración de Impacto Ambiental válidamente aprobada, **luego de cumplir con lo dispuesto en la Ley Sobre Política Pública Ambiental y el Reglamento [s]obre Declaraciones de Impacto Ambiental, para el proyecto de PR-66**". (Énfasis suplido.) El foro de instancia ordenó la paralización de las obras hasta tanto la ACT acreditara contar con una DIA Final aprobada de conformidad a la política pública ambiental.

Inconforme con dicho dictamen, el 1 de julio de 1999, la ACT acudió al Tribunal de Circuito mediante recurso de apelación acompañado de una moción en auxilio de jurisdicción para que se dejara sin efecto la orden del Tribunal de Primera Instancia. En esa misma fecha, el Tribunal de Circuito revocó la orden de paralización permitiendo que se continuaran los trabajos de construcción de la Ruta. Las Comunidades recurrieron de dicha resolución ante este Foro mediante recurso de certiorari el cual fue denegado. Posteriormente, es decir, el 30 de agosto de 1999, el Tribunal de Circuito dictó una sentencia mediante la cual revocó el dictamen de instancia que declaraba con lugar la demanda de *mandamus*. Fundamentó su determinación en que la Resolución 99-21-1 emitida por la JCA tornó la demanda de *mandamus* en académica. Señaló el foro apelativo que la determinación por parte de la JCA de que la DIA-P y el suplemento cumplían con la Ley sobre Política Pública Ambiental y que la "autorizaba" como la DIA Final debió cuestionarse directamente ante ellos mediante recurso de revisión administrativa. Finalmente, concluyó que el tribunal de instancia carecía de "competencia" para entender en el asunto.

El 7 de septiembre de 1999 las Comunidades recurrieron ante este Foro a través del recurso de certiorari que hoy nos ocupa. En síntesis, **cuestionan la determinación del Tribunal de Circuito de que**

**el recurso de *mandamus* resulta improcedente**.[3]  Arguyen que la ACT incumplió con su deber ministerial de emitir una DIA Final válida para la totalidad de la Ruta.  Señalan que la ACT ignoró tanto los requerimientos que hiciera el panel examinador de la JCA, como los señalamientos que hiciera este Tribunal en Colón Cortés I.  El recurso fue acompañado de una moción en auxilio de jurisdicción en la que solicitaron reinstaláramos la paralización de las obras de construcción de la Ruta decretada por el foro de instancia.  Alegaron que desde que el Tribunal de Circuito permitió la continuación de la construcción, ésta había proseguido a paso acelerado y que, por tanto, el recurso podía tornarse académico.

El 15 de septiembre de 1999 emitimos una orden de mostrar causa a ambas partes.  En esencia, le ordenamos que argumentaran la procedencia del *mandamus* para obligar a la ACT a obtener una DIA Final para la totalidad de la Ruta a la luz de la Resolución 99-21-1 emitida por la JCA.  Tras la comparecencia de las partes, el 5 de octubre de 1999 emitimos una resolución paralizando las obras de construcción y permitiendo la intervención de la JCA en el pleito.[4]

Un mes luego de nuestra resolución y aún pendiente la petición de certiorari ante nuestra consideración, la legislatura aprobó dos leyes. La Ley Núm. 323 de 6 de noviembre de 1999, que enmendó la Sec. 3.1 de la Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.R.A. sec. 2101, y la Ley Núm. 324 de 6 de noviembre de 1999, que añadió un tercer párrafo al inciso (c) del Art. 4 de la Ley sobre Política Pública Ambiental.  En lo

---

[3]   El señalamiento de error lee:

> Erró el Tribunal de Circuito de Apelaciones al concluir que "…una vez la Junta de Calidad Ambiental emitió la resolución 99-21-1 de 14 de junio de 1999, en la que autorizó la DIA Final para el Proyecto PR-66, el auto de *mandamus* dejó de ser el recurso apropiado y el Tribunal de Primera Instancia perdió competencia [jurisdicción] para revisar la validez de tal resolución."

[4]   La JCA fue parte en el primer pleito de revisión administrativa, Colón Cortés I, mas no así en la subsiguiente petición de *mandamus*,

pertinente al recurso ante nos, las nuevas leyes pretenden: (1) despojar el procedimiento de aprobación de una DIA de toda característica adjudicativa y establecer su carácter informal y meramente informativo; (2) eliminar la procedencia del *mandamus* para cuestionar "directa o indirectamente" una determinación de la JCA dando por cumplidos los requisitos del Art. 4(c) de la Ley sobre Política Pública Ambiental, disponiendo que la revisión judicial será el remedio exclusivo para revisar los méritos de estas "decisiones" administrativas; (3) eximir a ciertas agencias administrativas, entre ellas a la JCA, de tener que justificar sus determinaciones "informales" mediante resoluciones fundamentadas con determinaciones de hecho y conclusiones de derecho, y (4) permitir el fraccionamiento de proyectos para efectos del análisis ambiental. A pesar que la mayoría de las enmiendas establecidas por las leyes aprobadas intentan alterar la interpretaciones de la Ley sobre Política Pública Ambiental contenidas en Opiniones anteriores de este Tribunal, es esta última enmienda la que realmente afecta la médula del presente recurso.

El 10 de noviembre de 1999, la ACT presentó una moción de desestimación alegando que, a la luz de lo dispuesto por las Leyes Núms. 323 y 324, este Tribunal carecía de jurisdicción para considerar el recurso. Adujeron que los cambios en el derecho efectuados por dichas leyes tornaron las controversias ante nos en académicas. Además, la ACT anticipa el argumento de inconstitucionalidad de las nuevas leyes y defiende su validez apoyándose en que la legislación no ha adjudicado los méritos de la presente controversia judicial. Aducen que al aprobar las leyes la legislatura no ha usurpado el poder de este Tribunal de resolver controversias. En respuesta, las Comunidades presentaron escrito en oposición a la desestimación. En éste, impugnan la constitucionalidad de las referidas leyes por violar el principio de separación de poderes. Hemos dado el caso por sometido. Tras un

---

pues ésta iba dirigida únicamente a que la ACT cumpliera con sus deberes ministeriales.

profundo análisis del voluminoso expediente y las múltiples comparecencias de las partes, nos encontramos en posición de resolver.

La tarea ante nos es una delicada. El presente caso es muy particular. Por un lado, se trata de una controversia que surge por el incumplimiento obstinado de una agencia administrativa con los parámetros dispuestos en una Opinión anterior de este Tribunal. Por el otro, nos enfrentamos a actos legislativos que pretenden trastocar el sistema de frenos y contrapesos dispuesto en nuestra Constitución para evitar la llamada "tiranía de la mayoría".

La adecuada solución del presente caso requiere el análisis de varios asuntos. En primer lugar, debemos establecer el estado de derecho bajo el cual resolveremos las controversias en sus méritos. Para ello, pasaremos juicio sobre la validez de las Leyes Núms. 323 y 324, según aplicadas al caso de autos. En segundo término, expondremos el derecho ambiental pertinente a las Declaraciones de Impacto Ambiental y el rol de la JCA en el proceso de evaluación ambiental. Finalmente, discutiremos la procedencia del *mandamus*, según dispuesto por el Art. 20 de la Ley sobre Política Pública Ambiental, para compeler a la ACT a preparar una DIA Final para la totalidad de la Ruta que se ajuste a la política ambiental vigente.

Comenzaremos por reseñar brevemente las normas sobre la separación de poderes y las facultades constitucionales exclusivas e inherentes al poder judicial.

## II.

### A. <u>Separación de Poderes</u>

ESTADOS UNIDOS

Aunque la doctrina de separación de poderes no está explícitamente incorporada en la Constitución de Estados Unidos de América, el Tribunal Supremo Federal la ha reconocido implícitamente. Así, se ha

descrito la doctrina de separación de poderes como fundamental en el esquema democrático de gobierno de Estados Unidos, que anida en el esquema constitucional que limita y controla. National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 590-591 (1949)(citando a su vez a Principality of Monaco v. State of Mississippi, 292 U.S. 313, 323 (1934)).

Los forjadores de la Constitución de Estados Unidos consideraron muy necesaria la doctrina de la separación de poderes. Fueron dos los criterios principales: proteger la libertad de los ciudadanos, y **salvaguardar la independencia de cada rama del gobierno, evitando así que una rama domine a, o interfiera con, otra**. Antieau & Rich, Modern Constitutional Law, 2nd ed., Vol. 3, West, 1997, a la pág. 376. (Énfasis suplido.)

Aunque el primero que desarrolló la doctrina de separación de poderes fue John Locke, quien mejor o más convincentemente logró explicarla fue el Barón de Montesquieu. Éste advertía que cualquier combinación de los poderes ejecutivo, legislativo y judicial crearía un sistema con tendencia inherentemente tiránica. Montesquieu, The Spirit of the Laws, 151-2, según citado en Rotunda & Nowak, Tratise on Constitutional Law, Substance and Procedure, 3rd ed., West, 1999, § 3.12. Desde los tiempos de los forjadores se ha tenido en cuenta el esquema de Montesquieu. A éste se le ha descrito como un sistema de frenos y contrapesos que garantiza la independencia de cada rama y evita la acumulación de poder en una sola de ellas. Montesquieu escribió: "Cuando los poderes legislativo y ejecutivo están unidos en la misma persona, o en el mismo cuerpo de funcionarios, no puede haber libertad... **[N]o existe libertad si la rama judicial no está separada de las ramas ejecutiva y legislativa**". Montesquieu, The Spirit of the Laws, Book XI c 6. (Énfasis suplido.) Así mismo, James Madison defendió la Constitución de Estados Unidos adheriéndose a los principios de Montesquieu y describiendo la separación de poderes como "essential to a free government". Además, demostró cómo el esquema de

Montesquieu no requería una división estricta y categórica de funciones entre las tres ramas de gobierno. [5] The Federalist No. 48, a la pág. 408.

De otro lado, se ha dicho que el concepto de separación de poderes es más "una doctrina política" que un "una regla técnica de derecho". Frankfurter & Landis, Power of Congress over Procedure in Criminal Contempts in "Inferior" Federal Courts – A Study in Separation of Powers, 37 Harvard L. Rev. 1010, 1012-14 (1924).(Traducción nuestra.)

En repetidas ocasiones el Tribunal Supremo de Estados Unidos ha expresado que la doctrina de separación de poderes protege la libertad del ciudadano frente a una peligrosa acumulación de poder en una rama de gobierno. Así, en Union Pac. R. Co. v. U.S., 99 U.S. 700, 718 (1878), el Tribunal Supremo Federal resolvió que una rama del gobierno no puede usurpar o apropiarse de facultades de otra rama sin ocasionar daño. La seguridad de las instituciones, acotó el Tribunal, depende en gran medida de la estricta observación de estos principios.

Más adelante, en O'Donoghue v. U.S., 289 U.S. 516, 530 (1933), el Juez Sutherland expresó que la separación de poderes que emana de la Constitución no es una mera conveniencia o mecanismo de organización gubernamental. Por el contrario, se trata de algo básico y de vital importancia: prevenir o evitar el advenimiento de estos poderes, esencialmente diferentes, en las mismas manos. Salvaguardando esta

---

[5] La doctrina de separación de poderes establece que, de ordinario, cada rama ejerce de forma exclusiva los poderes que le han sido asignados constitucionalmente. Sin embargo, la separación entre ramas no es tajante, la propia constitución, en ocasiones, delega poderes típicos de una rama en otra. Así por ejemplo, el Art. V de nuestra Constitución al delegarnos responsabilidad en la preparación y aprobación de los reglamentos para la administración de los tribunales nos asigna facultades legislativas individuales. De otra parte nos da facultad compartida con la Legislatura y el Ejecutivo para aprobar reglas procesales y de evidencia. Igualmente, la rama Legislativa ejerce facultades adjudicativas asignadas constitucionalmente cuando realiza un proceso de residenciamiento.

Jurisprudencialmente hemos avalado como constitucional la delegación de facultades legislativas y adjudicativas a agencias administrativas. Sin embargo, todas estas delegaciones se han hecho dentro de unos parámetros y siempre, a la larga, pueden ser revisadas por los tribunales. (Énfasis nuestro.)

separación de poderes, según el Juez Reed, la democracia garantiza las libertades del Pueblo frente a excesivas concentraciones de poder. United Public Workers of America v. Mitchell, 330 U.S. 75, 91 (1947).

Como regla general, se entiende que **la doctrina de separación de poderes significa que la función judicial sólo puede ser llevada a cabo por la Rama Judicial**, y de la misma manera, que labores no judiciales deben ser dejadas para la correspondiente actuación de las otras ramas. Véase Antieau & Rich, op. cit. a la pág. 377.

Como hemos dicho, la doctrina de separación de poderes nunca pretendió establecer completa separación entre las ramas, sino un sistema de frenos y contrapesos que impidiera la excesiva acumulación de poder en una rama de gobierno, lo que necesariamente va en detrimento de las otras ramas y del ordenamiento constitucional en el que vivimos. El Tribunal Supremo de Estados Unidos, por voz de su Juez Presidente Marshall, en su célebre opinión de Marbury v. Madison, 5 U.S. 137 (1803), que toma hoy renovada vigencia, estableció que la rama ejecutiva debe acatar las órdenes de los tribunales para cumplir con el derecho, al igual que el Congreso no puede aprobar legislación que atente contra la Constitución. **Son los tribunales los intérpretes finales de la Constitución y las leyes**.

En cuanto a la revisión judicial, ésta surge en Estados Unidos a raíz de Marbury v Madison, supra. Allí se estableció que la determinación de si existe un conflicto entre una ley y la Constitución, y resolver dicho conflicto, "is of the very essence of judicial duty". Se resolvió, además, que "it is emphatically the province and duty of the judicial department to say what the law is". Añadió que lo contrario "would be giving to the legislature a practical and real omnipotence,... [and] reduces to nothing what we have deemed the greatest improvement on political institutions –a written constitution..." Véanse, además, Cooper v. Aaron, 358 U.S. 1, (1958); Baker v. Carr, 369 U.S. 186 (1962); Powell v. McCormack, 395 U.S. 486 (1969); United States v. Nixon, 418 U.S. 683 (1974).

El filósofo político Alexis de Tocqueville analizó cómo la humanidad ha enfatizado el rol primordial de la judicatura en la sociedad norteamericana. Expresó que los tribunales son el portaestandarte en que engranan nuestras instituciones gubernamentales. "Los tribunales son el timón que equilibra el sistema constitucional, y es el nuestro el sistema constitucional más equilibrado y controlado". Woodrow Wilson, Constitutional Government in the United States pág. 142, 1917 ed. (Traducción nuestra.)

Por otra parte, al analizar la verdadera autoridad o autonomía de operación que tienen los tribunales, se ha dicho que es una autoridad eminentemente moral, no tanto física. Redlich, Schwartz & Attanasio, Constitutional Law, 3rd ed., Matthew Bender, 1996, a la pág. 17. Operan los tribunales en gran medida por convicción moral, no sólo por el uso de la fuerza. Las cortes dependen de ayuda del ejecutivo incluso, algunas veces, para poner en vigor sus sentencias.

## PUERTO RICO

La separación de poderes en Puerto Rico está expresamente consagrada en la Sec. 2 del Art. I de la Constitución del Estado Libre Asociado de Puerto Rico. De igual manera, la revisión judicial es de abolengo constitucional. Antes del 1952, facultad de los tribunales para anular leyes emanaba exclusivamente de lo dispuesto en los propios fallos judiciales. Véase J. Trías Monge, Historia Constitucional de Puerto Rico, Vol. III, Ed. U.P.R., 1982, a la pág. 95. Desde entonces, nuestra Constitución se convirtió en la base revisión judicial al disponer la forma específica en que el Tribunal Supremo declarará inconstitucional una ley. 1 L.P.R.A. Art. V Sec.4.

En Silva v. Hernández Agosto, 118 D.P.R. 45, 54-55 (1986), reiteramos que los cuerpos legislativos no pueden convertirse en los jueces constitucionales de sus propios poderes. Es a los tribunales a quienes les corresponde interpretar las leyes y la Constitución. La interpretación inicial que de la Constitución haga otra rama merece

deferencia, pero debe prevalecer la norma que establece que la determinación final corresponde a los tribunales.

En Figueroa Ferrer v. E.L.A., 107 D.P.R. 250, 278 (1978), este Tribunal, por voz de su Juez Presidente señor Trías Monge, señaló, citando a Santa Aponte v. Srio. del Senado, 105 D.P.R. 750 (1977), que:

> […]**la función de interpretar la Constitución es atributo indelegable de la Rama Judicial. Es a los tribunales que les corresponde fijar el significado de las disposiciones constitucionales envueltas aquí**. Competería por entero la reglamentación de esta materia a la Rama Legislativa únicamente si resolviéramos que este Tribunal es impotente bajo la Constitución para proteger el derecho a la intimidad de los ciudadanos de este país en este aspecto de las relaciones familiares; que carece igualmente de poder para impedir la degradación a que a menudo se fuerza a los cónyuges bajo la situación imperante; y que su papel no puede rebasar al del simple espectador limitado a lo sumo a lamentar el desprestigio que sufre necesariamente un sistema jurídico divorciado de la realidad a la que se supone que sirva… [E]n buena teoría de adjudicación, además, los parlamentos no son los únicos agentes de cambios sociales necesarios. Cuando se trata de mantener vivo un esquema constitucional, de conservarlo en buena sintonía con las realidades del país, es principal deber de la judicatura propender igualmente a tal fin, aunque con la mesura y circunspección que le impone su papel dentro de nuestro sistema de gobierno y sin exceder el marco de sus atribuciones.

No hay duda que este Tribunal es "custodio y guardián máximo de nuestra Constitución". Zachry International v. Tribunal Superior, 104 D.P.R. 267 (1975); P.S.P. v. C.E.E., 110 D.P.R. 538 (1980), o "intérprete final" o "supremo", Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576 (1983). Véase, R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, Vol. I, 1986, Col Abo. de P.R., a las págs. 56-73.

En Santa Aponte v. Ferré Aguayo, 105 D.P.R. 670, 671 (1977), se resolvió que bajo nuestro sistema democrático, **"la autoridad para interpretar la Constitución y las leyes del país reside exclusivamente en la Rama Judicial... La Rama Judicial puede resolver que determinada facultad le corresponde tan sólo a otra Rama, pero la interpretación al efecto es atributo exclusivo de los tribunales."**(Énfasis suplido.)

En P.R. Tobacco Corp. V. Buscaglia, Tes., 62 D.P.R. 811, 822 (1944) este Tribunal dictaminó que es doctrina firmemente establecida por la jurisprudencia federal y estatal que **la Legislatura no está facultada para invadir el campo de acción del poder judicial, dejando sin efecto, modificando, o menoscabando una sentencia final dictada por una corte con jurisdicción para dictarla**.

Como sabemos, es de todo punto insostenible un esquema legal en que un fallo judicial esté supeditado a acción ulterior de la Asamblea Legislativa. Torres v. Castillo Alicea, 111 D.P.R. 792, 802-803 (1981). Su resultado sería nefasto. Quedaría una sentencia judicial sujeta y condicionada en su valor a que otra rama del gobierno le imparta su aprobación, todo ello, en contravención al principio de separación de poderes. Id.

En Misión Ind. P.R. v. J.P., res. el 30 de junio de 1998, 98 TSPR 86, 98 JTS 79 (en adelante Misión I) tuvimos la ocasión de elaborar sobre el concepto de separación de poderes. Se trataba allí, como aquí, de una situación de intromisión de la Asamblea Legislativa, en su función de legislar, con el ejercicio de la función judicial. En aquel entonces, el Tribunal de Circuito dictó una sentencia en la que revocó una decisión de la Junta de Planificación. En consecuencia, ordenó la paralización total de las obras objeto de aquella controversia, hasta que se cumpliera con la legislación y reglamentación aplicables. Menos de un mes después, la Legislatura aprobó y el Gobernador firmó una ley que autorizaba a la Junta a continuar de inmediato con el proyecto detenido, eximiéndola del cumplimiento de la Ley de Procedimiento Administrativo Uniforme y estableciendo nuevos procedimientos y requisitos para la autorización del proyecto y para la revisión judicial.

La Asamblea Legislativa fundamentó su actuación en su poder de reglamentación y en su facultad constitucional de proteger la vida, la

salud, y el bienestar del pueblo.[6]  Invocaron, además, la Sec. 19 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico sobre la obligación de conservar nuestros recursos naturales. Adujeron, en suma, que su premura la justificaba el estado de emergencia que aquejaba al pueblo y aseguraron entonces que la Asamblea Legislativa no estaba "revisando" la decisión del Tribunal de Circuito, sino que estaban alterando el estado de derecho vigente.  Alegaron haber establecido un nuevo

esquema, tanto sustantivo como procesal.  Como podrá notarse el razonamiento invocado por la Legislatura en este caso es harto similar al que invalidamos en Misión I.

Luego de elaborar extensamente sobre los orígenes, significado y alcance de la separación de poderes y la revisión judicial, concluimos que dicha ley era inconstitucional por contravenir el principio de separación de poderes.  Dijimos entonces: "El poder de revisar una sentencia le corresponde a la rama judicial.  Es una facultad que integra la entraña misma del poder que la Sección 1 del Art. V de la Constitución les asigna exclusivamente a los tribunales.  No es una facultad compartida con el poder legislativo, ni trasladable a éste por razón alguna."  Citando a Banco Popular v. Corte, 63 D.P.R. 66, 76 (1944), reiteramos que la esencia del poder judicial no puede ser destruida, "convirtiendo el poder para decidir en una débil oportunidad para consultar y recomendar".  Id.

Comentando Misión I, en particular sobre la opinión unánime del Tribunal en cuanto a este extremo, el profesor de derecho constitucional David Helfeld

concluyó que no podía ser de otra manera.  "Si el Tribunal Supremo hubiese acatado la Ley 19, las ramas políticas del gobierno podrían intervenir para asegurar el resultado de cualquier litigio, convirtiendo así a la rama judicial en un instrumento de su voluntad."

---

[6]    Véase, Sec. 19, Art. II de la Constitución del Estado Libre Asociado de Puerto Rico.

David Helfeld, <u>Derecho Constitucional</u>, 68 Rev. Jur. U.P.R. 345, 375 (1999).

**B. <u>Validez de las leyes</u>**

En la situación ante nos, la Asamblea Legislativa aduce que, al aprobar las Leyes Núms. 323 y 324, no pretende "revisar" sentencia alguna de este Tribunal. Argumentan, que las leyes bajo análisis no "adjudican" los méritos del caso que tiene este Tribunal ante sí. Con su actuación, sólo pretenden alterar algunos de los preceptos de derecho aplicables a los procedimientos que hemos tenido bajo nuestra consideración y "aclarar" a este Tribunal la intención legislativa y la forma en que deben interpretarse las disposiciones de ley que permanecen inalteradas. Recapitulemos lo que ha sucedido.

El 15 de septiembre de 1999, emitimos una orden de mostrar causa a las partes para que discutieran las razones por las cuales procedía o no el *mandamus* para compeler a la ACT a emitir una DIA Final para la totalidad de los segmentos de la Ruta. **En dicha resolución expusimos las controversias medulares que estaban siendo estudiadas por este Tribunal con relación al caso de marras**. El 5 de octubre de 1999, dictamos otra resolución en la cual, además de paralizar las obras, **este Tribunal intimó la procedencia del *mandamus* contra la ACT** en caso de que determináramos su incumplimiento con las "responsabilidades directas e indelegables" que le impone la Ley sobre Política Pública Ambiental y su reglamentación complementaria.

Apenas un mes más tarde, el 6 de noviembre de 1999, se aprobaron las Leyes Núms. 323 y 324. La Ley Núm. 323 tuvo el propósito de enmendar la Ley de Procedimiento Administrativo Uniforme a los fines de declarar como **procedimientos informales "sin función o característica adjudicativa alguna"**[7] a: (i) la adjudicación de subastas, (ii)concesión de préstamos, (iii) concesión de becas, (iv) concesión de subsidios,

(v) concesión de subvenciones, (vi) emisiones de deuda, (vii) inversiones de capital, (viii) reconocimientos o premios, y (ix) **todos los trámites o etapas del proceso de evaluación de documentos ambientales requeridos por el Art. 4(c) de la Ley sobre Política Pública Ambiental**. Según el nuevo precepto, en ninguno de estos procedimientos debe requerirse a las agencias que fundamenten sus resoluciones con determinaciones de hecho y conclusiones de derecho. Se reitera, además, la norma bien establecida de que el recurso adecuado para revisar los méritos de una decisión administrativa lo es la revisión judicial.

En Colón Cortés I, ley del caso en la presente controversia, resolvimos que al aprobar una DIA la JCA ejerce funciones que no son propiamente ni de reglamentación, ni adjudicativas. Luego, en Mun. de San Juan v. J.C.A., res. el 5 de octubre de 1999, 99 TSPR 147, 99 JTS 152 a la pág. 127, reiteramos la naturaleza sui géneris del procedimiento de aprobación de una DIA pero, además, **establecimos que el proceso, aunque informal e informativo, "goza de ciertas características adjudicativas**." (Énfasis suplido.) Dictaminamos, que "cuando la Junta considera y resuelve una solicitud de declaración de impacto ambiental, está ejerciendo poderes **cuasi-judiciales**." Id. (Énfasis suplido.) Recordamos que, independientemente de la naturaleza informal de la determinación de la Junta, ésta se encuentra sujeta a revisión judicial.

En atención a ello, establecimos en Mun. de San Juan, supra, que para los tribunales ejercer su función revisora y dar la debida deferencia a la determinación administrativa, "no bastan un récord de la prueba y una simple decisión." Concluímos que: (i) sólo si la Junta llega a conclusiones sobre hechos básicos y definitivos es que los tribunales podemos ejercer nuestra función revisora; y, (ii) bajo ningún concepto nuestra función revisora tiene el alcance de obligarnos a escudriñar en el expediente administrativo para dar con las bases

---

[7]    Véase la introducción a la Ley.

decisorias que utilizó la agencia. "Esto es deber exclusivo de la agencia y es ésta la que tiene la insoslayable obligación de poner al tribunal en posición de poder evaluar su determinación." Id. a la pág. 127 (Énfasis omitido.)

Finalmente, resolvimos en el citado caso que la Junta "viene obligada a emitir su determinación fundamentada" con conclusiones "**lo suficientemente definidas** como para poner a los tribunales en posición de determinar si los hechos, tal y como los encontró probados la Junta, ofrecen una base razonable para tal resolución." Id. (Énfasis suplido.) Como vemos, la Ley Núm. 323 intentó "revocar" nuestros pronunciamientos en Mun. de San Juan, supra y en Colón Cortés I. Sin embargo, ninguna de sus disposiciones resultan pertinentes o aplicables al presente caso. **Las Comunidades no interesan que revisemos y entremos en los méritos de la Resolución 99-21-1 de la JCA. El auto de *mandamus* no va dirigido contra dicha agencia, por lo tanto, no nos concierne si la Resolución está debidamente fundamentada o no**.

De otra parte, la Ley Núm. 324, enmendó los Arts. 4(c) y 20 de la Ley sobre Política Pública Ambiental. La Sec. 1 de dicha ley añadió al inciso (c) del Art. 4, un tercer párrafo subtitulado "Interpretación de las Disposiciones Legales." En lo aquí pertinente, dicho párrafo dispone:

> En aquellos casos donde el Gobierno de Puerto Rico adopte planes a largo plazo de desarrollo de infraestructura pública, en particular, pero no limitado únicamente a los proyectos de transportación contemplados en los planes viales de la Junta de Planificación, se reconoce que los proyectos asociados a dichos planes pueden llevarse a cabo por etapas, según la política pública y los recursos lo permitan. Las agencias e instrumentalidades del Gobierno de Puerto Rico **deberán someter las declaraciones de impacto ambiental, cuando correspondan, antes de proceder a la construcción de cualquiera de dichas etapas**.[…]"(Énfasis suplido.)

La disposición antes citada parece intentar derogar, *sub silencio*, el requisito del Reglamento de evaluar el impacto ambiental, individual y acumulativo, de todas las etapas de determinada propuesta en una sola DIA. En otras palabras, dicha sección permite a las agencias

gubernamentales someter las Declaraciones de Impacto Ambiental para proyectos de infraestructura pública al escrutinio de la JCA por pedazos.

En su Sec. 2, la Ley Núm. 324 intenta restringir la utilización del *mandamus* establecido en el Art. 20 de la Ley sobre Política Pública Ambiental. En lo pertinente, dispone que:

> […]cualquier persona natural o jurídica afectada por la falta de implementación de este Capítulo podrá acudir al Tribunal de Primera Instancia en solicitud de que se expida un *Mandamus* [sic] para que se cumpla con lo dispuesto en este Capítulo; **disponiéndose, no obstante, que dicho recurso no procederá para cuestionar una decisión de la Junta de Calidad Ambiental dando por cumplidos los requisitos del Artículo 4(c) de esta Ley** [Ley sobre Política Pública Ambiental] **al considerar un documento ambiental, lo que se hará exclusivamente en virtud de lo dispuesto en la Ley de Procedimiento Administrativo Uniforme**[…] (Énfasis suplido.)

Como podrá observarse, ambas leyes resultan algo contradictorias. Por un lado, la Ley Núm. 323 intenta hacer del proceso de DIA ante la JCA un proceso consultivo informal, "sin característica adjudicativa alguna", con el propósito de relevar a las agencias de fundamentar sus resoluciones con determinaciones de hecho y conclusiones de derecho. De otra parte, la Ley Núm. 324 pretende establecer que las resoluciones de la JCA constituyen una "decisión" a los fines de evitar que se utilice el recurso de *mandamus* para revisar "directa o indirectamente" los méritos de una resolución de la JCA dando por cumplidos los requisitos del Art. 4(c).

Para justificar su proceder, y al igual que en Misión I, la Asamblea Legislativa se apoya en su "amplia facultad" constitucional para aprobar leyes en protección de la vida, la salud y el bienestar de la ciudadanía. Añaden que el carácter representativo de la Asamblea Legislativa, al ser sus componentes electos directamente por el Pueblo, les permite ser el instrumento de la voluntad de éste. Sus actuaciones, por tanto, son las actuaciones del Pueblo, y es éste, argumentan, quien en última instancia detenta autoridad para ejercitar el "poder de razón de estado" a través de sus representantes

democráticamente electos. Parecen entender que dicho carácter representativo reviste de inmunidad cualquier acto legislativo.

Las Comisiones de lo Jurídico Civil y de Desarrollo Socioeconómico y Planificación, emitieron un informe conjunto en el que recomendaron la aprobación de la medida objeto de análisis. De dicho informe se percibe suma cautela en cuanto al tema de separación de poderes. Abordan los fundamentos expuestos por este Tribunal en Misión I. Argumentan las Comisiones en su informe que no se está infringiendo la doctrina de separación de poderes, sino que se están siguiendo los parámetros dispuestos por este Tribunal para el ejercicio constitucional del poder legislativo. También sostienen que el balance entre la más eficaz conservación de los recursos naturales y el medio ambiente, y el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad es de jurisdicción exclusiva de los cuerpos legislativos electos.

En realidad, la actuación en esta ocasión es en extremo análoga a la de Misión I, excepto que aquí, la ACT argumenta la acción legislativa de otra manera. Interpretan la actuación de la legislatura como la creación de un nuevo estado de derecho que "no ha pretendido hacer determinaciones de hechos [sic] ni conclusiones de derecho particulares". Aducen que la Legislatura no ha adjudicado los méritos de la controversia ante la consideración judicial. Añaden, citando nuestras expresiones en Misión I, que al legislar se pueden afectar litigios pendientes "siempre que [se] haga en el marco de la enunciación de una nueva norma de derecho y no meramente de la adjudicación de una controversia específica."

La ACT trata de distinguir a Misión I del presente caso aduciendo que allí el poder legislativo intentó dictar normas al poder judicial sin que mediase enmienda al derecho aplicable, y que aquí se aprobaron leyes para ello. Pretenden convencernos de que aquí se trata de simples enmiendas a una Ley que, incidentalmente, por razones de azar,

tornan académica la controversia ante nos.  Rechazamos la utilización

de nuestra propia jurisprudencia para semejante artificio.

La intención tras la aprobación de las Leyes Núms. 323 y 324 fue

ampliamente difundida por sus promoventes.[8]  La Exposición de Motivos de

ambas leyes revelan además una clara intención dual de la Asamblea

Legislativa.  Por un lado, las enmiendas intentan "corregir" las

interpretaciones legales que este Tribunal ha hecho del procedimiento

de una DIA en casos anteriores al presente.  Por el otro, intentan

abrogarse la facultad de adjudicar o predeterminar el resultado final

del caso que se encuentra actualmente ante nuestra consideración.  Lo

importante al determinar si cierta actuación legislativa infringe el

principio de separación de poderes, es si la intención clara y

específica de la ley fue afectar el resultado de un pleito particular.

Lo importante no es la forma del acto, sino su contenido.

Este Tribunal no puede hacer abstracción de la verdadera intención

y propósito tras determinada acción legislativa y conformarse con sólo

considerar lo que deliberadamente consignan en informes rendidos por

---

[8]     El Sr. Sergio González, Director Ejecutivo de la Autoridad de
Carreteras y Transportación, sustituto del demandado en el caso de
epígrafe, incluso antes de presentar ante nos la moción de
reconsideración a la orden de paralización que emitimos el 5 de octubre
de 1999, anunció que de este Tribunal resolverle adversamente,
recurriría a la Legislatura para que enmendara el derecho vigente de
forma tal que reautorizara la construcción. José Javier Pérez, "Miran
a la Legislatura para reiniciar la Ruta 66", El Nuevo Día, 8 de octubre
de 1999, pág. 10.  A los dos días, se reafirmó.  José Javier Pérez,
"Sobre 30 años de polémicas con la Ruta 66" El Nuevo Día, 10 de octubre
de 1999, pág. 6.  Por su parte, el gobernador de Puerto Rico, Hon.
Pedro Rosselló González, aseguró que el proyecto iba a continuar y que
"esto de estar deteniendo las cosas, de una filosofía de inacción, por
lo menos para nuestra administración no es aceptable.  Aquí vamos a
hacer las cosas y las vamos a hacer lo más rápido posible".  Endosó,
además, las alternativas que tenga el Presidente de la Cámara para "que
estos proyectos se puedan seguir".  Dennise Y. Pérez, "Favorece
Legislatura empuje proyectos", El Mundo, 9 de octubre de 1999, pág. 3.
De otro lado, el Presidente Cameral, Hon. Edison Misla Aldarondo,
"calificó como argumentaciones 'frívolas' las que utilizó el Tribunal
Supremo para detener ambos proyectos del Gobierno central".  Dennise Y.
Pérez, "Cámara comienza a darle la vuelta a dictámenes", El Mundo, 9 de
octubre de 1999, pág. 3.  Admitía el presidente cameral, además, que la
ley era temporera ("temporary"), cuya intención era lidiar con un
problema específico y urgente ("specific and urgent").  Rosario
Fajardo, "Misla legislation aimed at restarting stalled projects", The
San Juan Star, 29 de octubre de 1999, pág. 5.

las comisiones legislativas. La consecuencia de la legislación ante nuestra consideración es liberar a la

ACT de los deberes ministeriales que, según determinamos en Colón Cortés I, todavía no había cumplido. No podemos pecar de una ingenuidad tal que nos haga obviar cuál es el verdadero propósito y fin de determinada actuación, cegados por lo que convenientemente se nos presenta en alegatos jurídicos como el "propósito legislativo". No nos vamos a prestar a tal contradicción, ni al juego de palabras que a la postre no corresponde con la realidad.

Este Tribunal, como custodio e intérprete final de nuestra Constitución, la va a proteger y no va a permitir que acciones como la que hoy nos ocupa opaquen o disminuyan su valor, avalando que la parte que resulte o pudiera resultar perdidosa en un proceso judicial procure legislación de encargo que le permita continuar con una acción declarada ilegal por la Rama Judicial. Es decir, no podemos consentir que la Legislatura, con el aval del Gobernador, se convierta en un Tribunal Supremo *de facto*, revocando acciones tomadas por este Foro.

En virtud de lo anterior, resolvemos que la Sec 1 de la Ley Núm. 324, única de las enmiendas aplicable a la controversia ante nuestra consideración, resulta inconstitucional en su aplicación.[9] Ello, por contravenir el principio de separación de poderes. La Asamblea Legislativa ha usurpado de forma impermisible la facultad básica del Poder Judicial para estructurar remedios adecuados a los agravios que se le presentan. Ha pretendido además, revocar las determinación de este Tribunal en Colón Cortés I sobre las deficiencias de la DIA-P y el suplemento preparados por la ACT. Por último, ha tratado de afectar el resultado del presente caso.[10] Por las razones antes expuesta, el

---

[9] Por no encontrarnos propiamente ante un recurso de revisión administrativa de una determinación de la JCA sobre la aprobación de una DIA, no son de aplicación ni la Ley Núm. 323, ni la Ley Sec. 2 de la Ley Núm. 324.

[10] En vista de la conclusión a la que llegamos respecto a la inconstitucionalidad de la Sec. 1 de la Ley Núm. 324, según ésta se

**recurso ante nuestra consideración no se ha tornado académico. Pasemos ahora a considerar el resto de los planteamientos de las Comunidades.**

**III.**

Según advertimos en la primera parte de esta Opinión, las Comunidades impugnan la determinación del Tribunal de Circuito de que el recurso de *mandamus* se tornó académico una vez la JCA aprobó la Resolución 99-21-1. Señalan que la ACT aún no ha cumplido los requisitos sustantivos y procesales de la Ley sobre Política Pública Ambiental y su reglamentación complementaria. Indican que la ACT fraccionó indebidamente el proyecto de la Ruta 66 para efectos del escrutinio ambiental y, por consiguiente, procede expedir el auto de *mandamus* para compelerla a emitir una DIA Final válida para la totalidad del trayecto contemplado. Examinemos en primera instancia los

deberes de corte ministerial impuestos por la Constitución, la Ley sobre Política Pública Ambiental y la reglamentación complementaria a la ACT como agencia proponente.

**A. Deberes impuestos por la política pública ambiental relacionados al proceso de Declaración de Impacto Ambiental**

Se incluyen en la constitución de un país aquellos principios jurídicos a los cuales desea imprimírseles estabilidad. Se trata de aquellas normas sociales que se consideran vitales para la convivencia pacífica, el bien común y la continuidad de una democracia saludable. En suma, son reglas de carácter tan esencial para una sociedad, que su permanencia no se abandona a los vaivenes de gobierno o a meros cambios de idiosincrasia.

La protección del ambiente en Puerto Rico ostenta rango constitucional. La profunda preocupación de la Asamblea Constituyente

intenta aplicar al caso ante nuestra consideración, no pasamos juicio sobre su constitucionalidad según podría ser aplicada a otro caso.

por el uso prudente de nuestros escasos recursos y la conservación de la naturaleza para futuras generaciones, provocó que se plasmara de forma permanente la siguiente norma en la Sec. 19 del Art. VI de la Constitución:

> Será política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad[…]

Se establece como política pública un doble mandato cuyo fino balance asegura el desarrollo sostenible del país y la protección del medio ambiente para el disfrute de la presente y futuras generaciones. Al interpretar este doble mandato hemos señalado que el mismo:

> […]no es la expresión de un insigne afán, ni constituye tampoco sólo la declaración de un principio general de carácter exhortativo. Se trata, más bien de un **mandato que debe observarse rigurosamente, y que prevalece sobre cualquier estatuto, reglamento u ordenanza que sea contraria a éste**. Véase Misión Ind. P.R. v. J.C.A., res. 29 de junio de 1998, 98 TSPR 85, 98 JTS 77, a la pág. 1101. (Énfasis suplido.) (en adelante Misión II)

El referido mandato constitucional estableció un deber **ineludible y contínuo** de todos los componentes del Estado que prevalece sobre todo precepto estatutario que se le oponga. Id. Para instrumentar esta directriz, la Asamblea Legislativa aprobó la Ley sobre Política Pública Ambiental. En particular, resultan pertinentes a la consideración del presente recurso dos de sus disposiciones. Por un lado, el Art. 4(c) de la Ley, el cual establece una obligación de carácter ministerial para toda entidad gubernamental de producir un documento de evaluación ambiental **antes** de realizar o promulgar cualquier acción, legislación o decisión que afecte significativamente el ambiente. Por el otro, el Art. 20, el cuál incorpora el recurso de mandamus como remedio disponible a cualquier persona afectada por la falta de implantación de la Ley.

El Art. 4(c) de la Ley sobre Política Pública Ambiental, establece la obligación ministerial de toda agencia que desea llevar a cabo una

acción o promulgar una decisión que afecte significativamente el ambiente (en adelante agencia proponente), de emitir una Declaración de Impacto Ambiental.[11] En términos de contenido, el inciso exige que la DIA sea escrita y detallada, y que discuta cinco aspectos de la propuesta: (i) el impacto ambiental; (ii) los efectos adversos al ambiente que son inevitables; (iii) las alternativas a la acción o decisión propuesta; (iv) la relación entre usos locales a corto plazo del medio ambiente y la conservación y mejoramiento de la productividad a largo plazo, y (v) los compromisos irrevocables de recursos envueltos. Además, el Art. 4(c) requiere una consulta con el público y otras agencias concernidas antes de la emisión de una DIA Final.[12]

---

[11] La Sec. 2.1(h) del Reglamento Sobre Declaraciones de Impacto Ambiental de la Junta de Calidad Ambiental, Reglamento Núm. 3106 de 1 de junio de 1984, define la Declaración de Impacto Ambiental como "un proceso que analiza una propuesta acción gubernamental desde el punto de vista de su efecto sobre el ambiente, y los riesgos a la salud pública, según los dispone el Art. 4(c) de la Ley Número. 9 de 18 de junio de 1970, según enmendada y las disposiciones aplicables de este Reglamento y que culmina en un Documento de Viabilidad Ambiental."

[12] El Art. 4(c) de la Ley dispone:

Se ordena que al máximo grado posible se interpreten, implementen y administren todas las leyes y cuerpos reglamentarios vigentes en estricta conformidad con la política pública enunciada en este Capítulo. Así mismo, se ordena a los departamentos, agencias, corporaciones públicas, municipios e instrumentalidades del Estado Libre Asociado de Puerto Rico y sus subdivisiones políticas, que en la implementación de la política pública de este Capítulo, cumplan con las siguientes normas:
(a)…
(b)…
(c) Incluir en toda recomendación o informe[,] propuesta de legislación y emitir, **antes de efectuar cualquier acción o promulgar cualquier decisión gubernamental** que afecte significativamente la calidad del medio ambiente, una declaración escrita y detallada sobre:
  (1) El impacto ambiental de la legislación propuesta, de la acción a efectuarse o de la decisión a promulgarse;
  (2) cual[es]quiera efectos adversos al medio ambiente que no podrán evitarse si se implementare la propuesta legislación, si se efectuare la acción o promulgare la decisión gubernamental;
  (3) alternativas a la legislación propuesta, o a la acción o decisión gubernamental en cuestión;
  (4) la relación entre usos locales a corto plazo del medio ambiente del hombre y la conservación y mejoramiento de la productividad a largo plazo, y
  (5) cualquier compromiso irrevocable o irreparable de los recursos que estarían envueltos en la legislación propuesta si la misma se implementara, en la acción gubernamental si se efectuara o en la decisión si se promulgara.

Con el objetivo de establecer requisitos sustantivos y procesales para la emisión de una DIA válida conforme a lo establecido en el Art. 4(c), la JCA promulgó el Reglamento sobre Declaraciones de Impacto Ambiental de la Junta de Calidad Ambiental (en adelante el Reglamento).[13] Para facilitar la interpretación del Reglamento y como reglamentación complementaria, la JCA aprobó además, un *Manual para la preparación, la evaluación y el uso de las Declaraciones de Impacto Ambiental* (en adelante el Manual, en conjunto con el Reglamento, la reglamentación). Los mismos detallan los parámetros que debe cumplir una agencia proponente para contar con una DIA Final que se ajuste a la política pública ambiental.

Los procedimientos y requisitos de contenido establecidos en la reglamentación van dirigidos a "asegurar que la información relacionada con el ambiente y los recursos naturales esté disponible a los oficiales públicos responsables [de evaluar la acción u otorgar permisos] y a los ciudadanos, **antes de que se tomen decisiones y se implanten acciones…". Ésta va a "ayudar a los oficiales públicos a tomar decisiones que estén basadas en un claro conocimiento de las consecuencias ambientales envueltas**…". Véase Sec. 1.2(d) del Reglamento. Además, la declaración de política pública del

---

Antes de que el organismo concernido incluya o emita la correspondiente declaración de impacto ambiental, el funcionario responsable del mismo consultará y obtendrá la opinión sobre la legislación propuesta, la acción a efectuarse o la decisión gubernamental a promulgarse tenga cualquier otro organismo gubernamental con jurisdicción o ingerencia [sic] sobre el impacto ambiental de dicha legislación, acción o decisión.

Copias de dicha declaración de impacto ambiental y las opiniones de los organismos consultados, se harán llegar a la Junta de Calidad Ambiental, al Gobernador y a los cuerpos legislativos. Además, se tendrán a la disposición del público y se acompañarán a la propuesta de legislación, acción o decisión para los correspondientes procesos de examen y estudio a través de los organismos gubernamentales.

Se faculta a la Junta de Calidad Ambiental para aprobar reglamentos para implementar las disposiciones de este inciso.

[13] La Sec. 1.2(c) del Reglamento establece: "El propósito de este Reglamento es el de establecer los requisitos procesales y de contenido para la debida implementación del Art. 4 de la Ley sobre Política

Reglamento enfatiza el objetivo de utilizar los mecanismos allí establecidos para **"identificar y evaluar las alternativas razonables** que existan para las acciones propuestas, **las cuales aminorarían o minimizarían los efectos adversos** de dichas acciones sobre la calidad del ambiente humano." (Énfasis suplido.)

Como instrumento de planificación, el proceso de DIA procura evitar que se tomen decisiones inconscientes que resulten en la dilapidación insostenible de nuestros limitados recursos naturales. Se aspira a que las decisiones gubernamentales que atañen al ambiente se tomen cuidadosamente y con una visión responsable de futuro. Por ello, el Reglamento claramente exige a toda agencia proponente el cumplimiento estricto con sus disposiciones y las del Manual **antes** de promulgar acción o tomar decisión alguna que afecte al ambiente de forma significante. La reglamentación enfatiza repetidamente que **la DIA-P debe prepararse lo antes posible dentro del desarrollo del proyecto y que, cualquier caso, siempre debe contarse con una DIA Final "treinta (30) días calendario antes de iniciar la acción propuesta".** Véanse las Secs. 5.5.1 y 5.5.7 del Reglamento. Entendemos, pues, que la DIA Final es, a su vez, requisito previo esencial para la validez de todo permiso que se emita en torno a una acción propuesta. Veamos qué se requiere para contar con una DIA Final.

Desde el punto de vista procesal, la DIA Final tiene que pasar por cuatro etapas. El proceso de DIA comienza con la preparación de una Evaluación Ambiental por parte de la agencia proponente que le permitirá a ésta decidir si su propuesta requiere la preparación de una DIA Preliminar o una Determinación de Impacto Ambiental No Significativo. **Culmina con la emisión por parte de la agencia proponente de una DIA Final que debe ajustarse en términos procesales y sustantivos a lo dispuesto en la Ley sobre Política Pública Ambiental, supra, y la reglamentación. La DIA Final:**

---

Pública Ambiental, según enmendada, y cumplir así con los objetivos de dicha Ley".

[e]s la que **preparará la agencia proponente** incorporando y ofreciendo consideración a los comentarios del público, de la JCA y/o [sic] de las agencias comentadoras respecto a la DIA Preliminar o a cualquier suplemento de la misma. (Énfasis suplido.) Reglamento sobre Declaraciones de Impacto Ambiental Sec. 2.1 (j).

Como podrá notarse, dentro del esquema que se ha adoptado, la responsabilidad de cumplir con el procedimiento y de emitir una DIA Final adecuada la tiene la agencia proponente. La Sec. 5.5.6.1 del Reglamento, permite a la agencia proponente considerar su DIA Preliminar como DIA Final cuando:

    a.   La DIA Preliminar preparada satisfaga **todos los requisitos** del Art. 4(c) de la Ley Número 9, del 18 de junio de 1970, según enmendada, y de este Reglamento.

    b.   Los comentarios hechos sobre la DIA Preliminar sean favorables.

    c.   La preparación de una DIA Final constituya una repetición de la información incorporada a la DIA Preliminar.

   ch.   No existan comentarios de importancia que considerar en una DIA Final, **y**

    d.   **Cuando la Junta así lo recomiende**. (Énfasis suplido.)

En el caso de autos la ACT entiende que cuenta con una DIA Final meramente porque la JCA "aprobó" el cumplimiento de la DIA-P y su suplemento con el Art. 4(c) de la Ley sobre Política Pública Ambiental. Bajo las circunstancias específicas de este caso, no les asiste la razón.

En <u>Colón Cortés I</u>, a la pág. 1124, **este Tribunal señaló que, conforme al informe del panel examinador aprobado por la Junta de Gobierno de la JCA, la ACT venía obligada a "discutir con mayor detalle, entre otros aspectos, (1) las alternativas evaluadas, (2) las presiones de desarrollo a lo largo de la vía y (3) el impacto ambiental acumulativo de todas las etapas del proyecto**." Obsérvese que nuestra Opinión se emite **después** que la ACT había preparado el suplemento, por ende, tanto la DIA-P como su suplemento estuvieron ante nuestra consideración y fueron evaluados por este Tribunal.

En Colón Cortés I **también advertimos que la ACT no cumplió con ninguno de los incisos de la (a) a la (ch)** previamente transcritos. **Además**, señalamos que faltaba que la JCA emitiera una resolución formal donde determinara que el suplemento había cumplido con lo requerido por el panel examinador y lo recomendara para pucblicación como DIA Final. Véase, Colón Cortés I, supra, a la pág. 1126. La única diferencia entre los hechos que contemplamos ahora y los que tuvimos ante nosotros entonces, es que la JCA ha emitido la referida "recomendación favorable". Ello satisface únicamente el requisito (d) de la Sec. 5.5.6.1 del Reglamento. La ACT tenía el deber ministerial de atender los señalamientos del panel examinador recopilados en la Opinión de este Tribunal para así poner a la JCA en la posición de fiscalizar adecuadamente la evaluación ambiental del proyecto. Nada ha hecho la ACT para cumplir con los deberes ministeriales señalados .

Resulta claro que en Colón Cortés I este Tribunal determinó que **ambas**, tanto la JCA como la ACT, aún tenían deberes ministeriales que cumplir. Interpretar otra cosa resulta contrario a lo que expresamos en dicha Opinión. ¿Qué sentido tendría entonces el que le indicáramos a las Comunidades que tenían disponibles el recurso de *mandamus* del Art. 20 de la Ley sobre Política Pública Ambiental "para hacer valer la obligación **de la ACT**"? De nada sirve la resolución favorable de la JCA, si la ACT no ha cumplido en la realidad con los requisitos sustantivos y procesales del Reglamento y el Manual. Si la ACT no cumplió con requisito alguno de los enumerados en los incisos (a) a la (ch) de la Sec. 5.5.6.1 a pesar de que en Colón Cortés I le señalamos específicamente esta deficiencia, no podía considerar la DIA P y su suplemento como DIA Final. Ello independientemente de que la JCA haya avalado mediante resolución la inercia de la agencia proponente.

Ciertamente la resolución favorable de la JCA de una DIA, de ordinario, merece gran deferencia. No hay que olvidar que se trata de la agencia con conocimiento especializado encargada de fiscalizar el cumplimiento de la Ley sobre Política Pública Ambiental. **No obstante**

**dicha aprobación no necesariamente inmuniza a la agencia proponente** de una reclamación subsiguiente. Una resolución aprobatoria no puede relevar a la agencia proponente de satisfacer **en la realidad** los requisitos establecidos en la Ley sobre Política Pública Ambiental y su reglamentación complementaria. Máxime bajo las circunstancias muy particulares del presente caso, donde, tanto el panel examinador de la propia JCA, como este Tribunal, pasaron juicio sobre los hechos y señalaron las serias deficiencias que adolecía la evaluación ambiental realizada por la agencia proponente en la DIA-P y su suplemento.

¿Cuál es entonces el rol de la JCA y el valor de su intervención en el proceso ambiental?:

> Tiene la responsabilidad de velar porque la declaración de impacto ambiental presentada ante su consideración cumpla cabalmente con todos los requisitos legales y reglamentarios pertinentes. Su rol fiscalizador incluye también constatar que el análisis de las consecuencias ambientales formulado por la agencia proponente en la declaración de impacto ambiental sea riguroso y completo, y que ofrezca al público toda la información pertinente. Misión II, supra, a la pág 1106.

De lo anterior se desprende claramente que la JCA tiene el deber ministerial de escrutar cuidadosamente la evaluación ambiental realizada por la agencia proponente para comprobar el cumplimiento de los requisitos procesales y sustantivos impuestos por la política pública ambiental. No se disputa la deferencia que merecen las determinaciones de la JCA. Tampoco está en duda que **la resolución aprobatoria de la JCA es un requisito previo indispensable** para que una agencia proponente pueda contar con una DIA Final. No obstante, el procedimiento de Declaraciones de Impacto Ambiental no otorga a dicha resolución valor propiamente adjudicativo. Véase Reglamento, supra, Introducción, inciso 7.

En última instancia, la responsabilidad de cumplir con los requisitos de la política pública ambiental y de contar con una DIA Final corresponde a la agencia proponente y esa responsabilidad continúa aunque la JCA haya aprobado una DIA Final. Es ésta la que

tiene la responsabilidad de decidir, luego de cumplir con todos los requisitos y de contar con la aprobación de la JCA, cuando cuenta con una DIA Final:

> La responsabilidad de cada Declaración de Impacto Ambiental **recae totalmente sobre la agencia que propone** la obra o actividad que pueda afectar sustancialmente el ambiente. Dentro de los límites que fijan la Ley Núm. 9 y las directrices de la Junta de Calidad Ambiental, **corresponde al organismo gubernamental auspiciador del proyecto decidir si requiere o no una Declaración, y determinar el contenido de ésta**, **así como la exactitud de sus datos y la solidez de sus juicios analíticos**. Reglamento, supra, Introducción inciso 3. (Énfasis suplido.)

Nótese la sabiduría de imponer sobre la agencia auspiciadora de un proyecto o decisión la responsabilidad de contar con una evaluación ambiental adecuada que incluya el aval de la JCA. **La entidad proponente es la que siempre deberá responder directamente a los ciudadanos por las consecuencias de sus actos u omisiones, y estos últimos, a su vez, tendrán en todo momento disponibles los remedios establecidos en el Art. 20 de la Ley sobre Política Pública Ambiental para asegurarse que la agencia cumple con sus deberes**. No podrá escudarse la agencia proponente tras el aval de la JCA para evadir sus responsabilidades. Cuando la gestión fiscalizadora de la JCA falle, la Declaración de Impacto Ambiental no se prepare de buena fe, se haga de una manera proforma, o la acción propuesta tenga efectos no previstos, las personas afectadas tienen, mediante el auto de *mandamus* establecido en el Art. 20, supra, el poder de recurrir a los tribunales para obligar a la agencia proponente a ajustar sus actos a la política pública ambiental. Véase Misión II, supra.

No pretendemos con nuestro dictamen debilitar a la JCA, ni restar valor a su labor fiscalizadora, sino clarificar la extensión de las responsabilidades directas e indelegables de la agencia que propone y promulga un proyecto. Insistimos en que, de ordinario, la resolución de la JCA aprobando el cumplimiento con la política pública ambiental merece gran deferencia, no sólo por parte de la agencia proponente, sino también de los tribunales al revisar. Sin embargo, esto no

significa que vayamos a aceptar ciegamente y sin el análisis correspondiente cualquier resolución emitida por la JCA sobre el asunto.

No debemos perder de vista el hecho de que el Art. 20 de la Ley sobre Política Pública Ambiental inmuniza a la JCA de toda responsabilidad en daños y perjuicios por incumplimiento con la política pública ambiental.[14] Ello, refuerza nuestra conclusión de que la agencia proponente de un proyecto tiene la responsabilidad directa de emitir una DIA Final adecuada. La norma adoptada en el día de hoy deja la puerta abierta para otorgar remedio en situaciones excepcionales. El caso de autos, por sus hechos muy particulares, refleja que estamos ante una de éstas.

Como destacáramos anteriormente <u>Colón Cortés I</u> fue resuelto **después de emitido el suplemento, pero antes de que la JCA emitiera la Resolución 99-21-1**. Allí recogimos algunos de los defectos que aún adolecía el suplemento presentado por la ACT. Hicimos particular hincapié en la solicitud del panel a los efectos de que la **DIA Final incluyera el impacto acumulativo de todos los segmentos del proyecto**. En concreto, indicamos que la determinación de la JCA de que "cualquier proyecto de construcción de carretera que conecte al evaluado en [ese] documento ser[ía] tratado como un proyecto individual…" resultaba contraria a sus propios actos. Enfatizamos que dicha determinación era "incompatible con el requerimiento que hizo la propia JCA en su resolución de 13 de mayo de 1993, al adoptar el informe del panel examinador, en cuanto a la necesidad de que la DIA-P discutiera el impacto acumulativo de **todas las etapas del proyecto propuesto**." Véase

---

[14] Al enmendarse el Art. 20 en 1973, se añadió una oración a los efectos prohibir que se incoaran acciones en daños contra la JCA por falta de implantación de la Ley sobre Política Pública Ambiental. En lo pertinente, la disposición provee:

> …Nada de lo dispuesto en este Capítulo podrá interpretarse como que permite una persona natural o jurídica incoar acciones en daños y perjuicios a la Junta de Calidad Ambiental por falta implantación de este Capítulo.

<u>Colón Cortés I</u>, supra, pág. 1124 esc 3. Cabe señalar que los comentarios de otras agencias especializadas en cuestiones ambientales incluidos en el apéndice de la DIA-P reflejan idéntica preocupación.

No obstante, la ACT hizo caso omiso a nuestros señalamientos. Simplemente acudió directamente a la JCA en busca de aval para su incumplimiento. La JCA por su parte, aún en ausencia de acto afirmativo alguno de la ACT para corregir las deficiencias previamente señaladas, emitió de manera proforma una resolución "aprobando" el suplemento como DIA Final.

Así pues, por un lado, nos encontramos ante una situación en la que la agencia proponente de un proyecto se empeña obstinadamente en evadir el escrutinio del impacto ambiental acumulativo de su propuesta. Mientras por el otro, vemos a la agencia encargada de salvaguardar nuestros recursos naturales, actuando en contra de sus propios actos y abdicando su deber fiscalizador.

Tras estudiar detenidamente la DIA-P, los informes del panel examinador y el suplemento a la luz, tanto de los requisitos establecidos en el Art. 4(c) de la Ley sobre Política Pública Ambiental, como los del Reglamento y el Manual, no albergamos duda de que los incumplimientos de la ACT son múltiples y graves. Sin embargo, no resulta ni prudente, ni necesario entrar en los méritos específicos de la Resolución 99-21-1 de la JCA. Como correctamente señalan el Tribunal de Circuito y la ACT, esos planteamientos debieron examinarse mediante un recurso de revisión.[15]

Ahora bien, aún si presumiéramos la validez y corrección de la resolución aprobatoria emitida por la JCA en torno a la ruta acortada, la ACT no ha cumplido aún con el deber ministerial de producir una DIA Final **para la totalidad de las etapas** de la Ruta 66. La ACT

---

[15] Los peticionarios optaron por no usar este recurso el cual tenían disponible.

carecía de discreción para ignorar este deber una vez señalado por el panel examinador y avalado por este Tribunal en una Opinión.

Pasemos ahora a examinar la postura de la ACT de que el impacto ambiental de la ruta acortada debe evaluarse de forma independiente al resto del proyecto inicialmente propuesto.

## B. **Segmentación**

La ACT sostiene la teoría que el acto de acortar la longitud de la Ruta 66 y **dejar en suspenso** la construcción de los tramos de Río Piedras a Carolina y de Canóvanas a Río Grande no constituye una fragmentación ilegal del proyecto con el fin de evadir el escrutinio ambiental. Basan su contención en que el

tramo de Carolina a Canóvanas constituye una fase autosuficiente que debe evaluarse de forma independiente a cualquier segmento que se le conecte eventualmente. Arguyen que dicho tramo, por sí solo, cumple con los parámetros establecidos por el Reglamento del Consejo de Calidad Ambiental federal[16] (en adelante CEQ, que son sus siglas en inglés), aprobado al amparo de la Ley Federal de Política Pública Ambiental[17] (en adelante NEPA que son sus siglas en inglés). Entienden que conforme a las Guías de la Administración Federal de Carreteras (en adelante FHA que son sus siglas en inglés),[18] y su jurisprudencia interpretativa, la evaluación ambiental de la Ruta no ha sido ilegalmente fraccionada. Señalan, que por derivarse nuestra Ley de la NEPA y ser el Reglamento de la JCA similar al Reglamento de la CEQ, dichos parámetros resultan decisivos al determinar si un proyecto ha sido indebidamente segmentado. Sus argumentos no nos convencen. Veamos.

---

[16] Council on Environmental Quality Regulations, 40 C.F.R. secs. 1500-1517.
[17] National Environmental Policy Act, 42 USCA sec. 4331 et seq.
[18] Federal Highway Administration Guidelines, 23 CFR 777.111 (f).

Ciertamente este Tribunal ha reconocido el valor persuasivo que, de ordinario, gozan las interpretaciones de NEPA en materia ambiental. Ello, porque nuestra Ley sobre Política Pública Ambiental utilizó a ésta como modelo. No obstante, hemos aclarado que este Tribunal está facultado para darle un contenido distinto a nuestra Ley. Véase Mun. de San Juan v. J.C.A., supra, a la pág. 124. Aunque la letra de las disposiciones de ambas leyes sea parecida o incluso idéntica, la Ley sobre Política Pública Ambiental debe interpretarse a tono con nuestras particulares realidades jurídicas, geográficas, sociales y económicas. En el caso particular de la prohibición al fraccionamiento de proyectos hay varias consideraciones que han movido el ánimo de este Tribunal a desviarse de la interpretación propuesta por la ACT.

Sobre este particular, resulta importante resaltar que las cláusulas que prohiben la segmentación para efectos del escrutinio ambiental en nuestro Reglamento fueron **redactadas de forma distinta a su equivalente** en el Reglamento de la CEQ. Como veremos, las exigencias de nuestro Reglamento son mayores y más estrictas. Al evaluar la pretendida segmentación en el caso ante nos hay que sopesar, además, los objetivos del proyecto, según éstos han sido esbozados por la propia ACT, a la luz de las realidades geográficas del país. Si a todo esto se le añade que los comentarios sobre el proyecto que constan en el récord, hechos tanto por parte del panel examinador de la JCA, como por parte de otras agencias especializadas en recursos naturales, invariablemente contienen expresiones sobre el deber de evaluar conjuntamente el impacto ambiental de la totalidad de las etapas de la Ruta 66; no podemos menos que concluir que en este caso el proyecto ha sido indebidamente segmentado para propósitos de preparar la DIA Final.

La Ley sobre Política Pública Ambiental establece como criterio general para determinar la necesidad de una DIA el que una decisión o acción afecte significativamente el ambiente. La Sec. 5.2(e) del Reglamento específicamente dispone que se **requerirá** la preparación de

una DIA cuando el efecto significativo ocurra como consecuencia de "[c]ualquier proyecto o acciones [sic] por etapas que individualmente no requerirán una DIA, **pero que en conjunto podrían tener un impacto significativo acumulativo, el cual requiere una DIA que integre todas las etapas**." (Énfasis suplido.)  Esto es, cuando las distintas etapas de un mismo proyecto tengan un impacto ambiental acumulativo, la preparación de una DIA para la totalidad de las fases es **obligatoria**.

La disposición antes citada va dirigida a evitar que la agencia proponente circunvale la necesidad de realizar una DIA sometiendo su acción o decisión al escrutinio ambiental por pedazos pequeños cuyo impacto ambiental  no es significativo individualmente, pero que acumulativamente si lo resulta. La Sec. 5.5.1.5 del Reglamento también exige que se evalúe en conjunto el impacto ambiental acumulativo **de todo proyecto a desarrollarse en etapas**.  En lo pertinente, la sección dispone:

> **Cuando se trate de un proyecto o acción que se contemple desarrollar por etapas, se preparará una DIA que incluya todo el proyecto**, discutiendo cada etapa, así como el conjunto total de éstas.  Si durante el desarrollo del proyecto se elimina, amplía o modifica sustancialmente el concepto original del proyecto, se deberá determinar si el cambio contemplado requiere preparación de nueva DIA. **Deberá tomarse en consideración, tanto las etapas ya desarrolladas como las propuestas** y reflejar cualquier cambio en diseño, tamaño, densidad, uso, demanda de servicios, necesidad de infraestructura y otros aspectos relevantes.  (Énfasis suplido.)

De modo que nuestra reglamentación, a pesar de permitir el desarrollo de proyectos por fases o etapas, manda que se incluyan la totalidad de éstas en la misma DIA.  Ello, independientemente de que se contemple implementar las etapas subsiguientes de una propuesta en un futuro, o de que no haya absoluta certidumbre sobre su realización.

La reglamentación federal es más laxa.  A diferencia de nuestro Reglamento, el cual exige una DIA integral para todo proyecto a desarrollarse por etapas, el  reglamento de la CEQ sólo requiere una DIA conjunta para "propuestas o partes de propuestas estén **tan**

**estrechamente relacionadas entre sí que puedan considerarse como una sola acción**." 40 CFR sec. 1502.(a) (Traducción nuestra y énfasis suplido.)

Para determinar si dos o más propuestas se encuentran lo suficientemente relacionadas para exigir que se evalúen en la misma DIA, la Sec. 1508.25 del Reglamento de la CEQ establece que se tomen en consideración una serie de factores. A saber:

> (a) Actions rather than unconnected single actions which means that they are closely related and therefore should be discussed in the same impact statement. **Actions are connected if**:
>
> 1.**Connected actions**, which means that they are closely related and therefore should be discussed in the same impact statements. Actions are connected if they:
>
> (i)    Automatically trigger other actions which may require environmental impact statements.
> (ii)   Cannot o will not proceed unless other actions are taken previously or simultaneously.
> (iii)  **Are interdependent parts of a larger action and depend on the larger action for their justification**.
>
> 2.**Cummulative actions**, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement. (Énfasis suplido.)

La ACT alega que para probar un reclamo de fragmentación impropia de un proyecto debe demostrarse, "por preponderancia de la evidencia", que el segmento propuesto:

a) no tiene términos lógicos;

b) no tiene utilidad independiente; y que

c) elimina la posibilidad de considerar alternativas.

Arguye que estos criterios corresponden a los establecidos en el Reglamento de la Administración Federal de Carreteras (FHA) y analiza la ruta acortada a su amparo para concluir que se trata de un proyecto independiente a cualquier tramo posterior. Se equivoca.

La ACT toma los criterios previamente enumerados de la Sec. 771.111 del reglamento de la FHA. Éste, además de ser de naturaleza

ilustrativa, regula sólo el **escrutinio inicial** que hace la propia Autoridad de Carreteras Federal, agencia proponente, sobre la adecuacidad de su DIA Preliminar antes de someterla para la aprobación de la Agencia para la Protección del Ambiente federal (Environmental Protection Agency, en adelante EPA).[19] La referida reglamentación, convenientemente sintetizada por la ACT, en realidad provee lo siguiente:

> In order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated, the action evaluated in **each EIS** or finding of no significant impact (FONSI) shall:
>
> (1) Connect logical termini and **be of sufficient length to address environmental matters on a broad scope**;
> (2) Have independent utility or independent significance, i.e., be usable **and a reasonable expenditure even if no additional transportation improvements in the area are made**; **and**
> (3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements. (Énfasis suplido.) 23 CFR sec. 771.111(f), 1992.

Cabe señalar que los criterios antes citados fueron adoptados por una agencia que promulga y fomenta la construcción de carreteras, a quien conviene un estándar ambiental laxo, y no por la agencia encargada de custodiar el ambiente. Ahora bien, aún si analizáramos la ruta acortada bajo los criterios antes esbozados, nos veríamos forzados a concluir que el proyecto ha sido indebidamente fraccionado.

No nos convence el argumento que propone la ACT de que cualquier carretera que una a dos ciudades tiene términos lógicos. Esto quizás pudiera resultar cierto en los Estados Unidos, donde muchas de las ciudades cuentan con una población millonaria y se encuentran a una distancia considerable la una de la otra. Difícilmente puede argumentarse que los Municipios de Carolina y Canóvanas constituyen "ciudades" bajo estos estándares y que un segmento de "expreso

---

[19] Como se podrá notar, la reglamentación citada corresponde a la agencia que promulga el proyecto y no a la que fiscaliza el cumplimiento con la política pública ambiental. Además, entendemos que el esquema administrativo ambiental federal es distinto al nuestro. La función regulatoria se encuentra en una agencia, la CEQ, y la

controlado por peajes" entre ellos, por sí solo, tiene términos lógicos.

La insensatez de los "términos" de la ruta acortada la resalta el que la ACT continúe señalando como objetivo primordial de ésta el unir el Área Metropolitana de San Juan con el área Este. Resulta evidente que para el logro de los fines esbozados, tendrán que construir tramos subsiguientes. No cuesta demasiado esfuerzo entender que un expreso que une a Carolina con Canóvanas, por sí solo, **no** provee una vía alterna entre el Area Metropolitana de San Juan y el área Este. Tampoco vemos cómo puede justificarse la pérdida a largo plazo de áreas verdes con el beneficio a corto plazo de reducir en unos cuantos minutos el tiempo de recorrido entre un Municipio y otro.

Al así resolver, no hemos podido abstraernos de la realidad física de nuestro país. A diferencia de la mayoría de los estados cuya jurisprudencia cita la ACT, Puerto Rico es una isla pequeña, densamente poblada y con escasos recursos naturales. Tomamos conocimiento judicial de nuestras limitaciones geográficas y sociales, y no podemos ignorarlas al interpretar las leyes que se aprueban con el propósito de proteger el ambiente. Tampoco hemos podido obviar el que la protección al ambiente ostente en nuestra jurisdicción rango constitucional.

No se discute el hecho de que las obras de infraestructura puedan realizarse por etapas. Nada en la Ley sobre Política Pública Ambiental impide que los proyectos se desarrollen de este modo. Por el contrario, puede argumentarse que de ordinario las obras públicas de infraestructura, por sus costos y complicaciones, se van construyendo de esta manera. La Ley sobre Política Pública Ambiental contempla este supuesto, pero a su vez exige que en este tipo de desarrollos la DIA se prepare para la totalidad de las etapas planificadas. Ello, independientemente de que de inmediato sólo se vaya a construir una parte y que el resto del proyecto quede en suspenso para un futuro.

fiscalizadora en otra, la EPA. En Puerto Rico ambas funciones son realizadas por la JCA.

Interpretar lo contrario derrotaría la utilidad de la DIA como instrumento de planificación ordenada a largo plazo y atentaría contra el objetivo primordial de la Ley sobre Política Pública Ambiental: la conservación ambiental y el uso prudente de nuestros recursos naturales. Ello cobra mayor relevancia cuando se trata de recursos no renovables y sumamente escasos en nuestra isla como lo son el terreno y los humedales.

No es la intención de este Tribunal usurpar o limitar la facultad de la ACT de decidir la longitud o ubicación de las carreteras en Puerto Rico. Nada de lo aquí resuelto debe interpretarse como que impide que la agencia pueda someter en el futuro un proyecto de carretera entre Canóvanas y Carolina. Sin embargo, la propuesta que se someta debe ser **en realidad un nuevo proyecto**, no un subterfugio para ir adelantando por segmentos la construcción de un proyecto mayor.

Reiteramos que, con respecto al proyecto que está ante nuestra consideración ahora, el acto de acortar la longitud de la Ruta 66 y dejar en suspenso los tramos de Río Piedras a Carolina y de Canóvanas a Río Grande, mientras se procede a construir el trayecto entre Carolina y Canóvanas, no convierte a este último trayecto en uno independiente del resto de la propuesta. Claramente se trata del fraccionamiento de un plan más amplio, no de un proyecto nuevo de menor alcance y distinto al anterior.

Explicadas las razones por las cuales la ACT tiene el deber ministerial de producir una DIA Final para la totalidad de las fases proyectadas para la Ruta 66, corresponde examinar los motivos por los cuales procede expedir el auto de *mandamus* para compelerla a ello.

## C. Procedencia del *mandamus* bajo la Ley sobre Política Pública Ambiental

Tanto la ACT como el Tribunal de Circuito entienden que una vez la JCA emitió la Resolución 99-21-1 "aprobando" el suplemento como DIA

Final para la Ruta, el auto de *mandamus* dejó de ser el recurso apropiado para revisar la validez de la determinación administrativa. Señalan que esta determinación tenía que cuestionarse mediante un recurso de revisión administrativa cuya competencia exclusiva es del Tribunal de Circuito. Razonó el foro apelativo que al ser el *mandamus* un recurso extraordinario, sólo procede "si se demuestra que el peticionario no tuvo ni tiene disponible un procedimiento ordinario." Erró el Tribunal de Circuito en su interpretación.

El foro apelativo analiza la procedencia del *mandamus* en el presente caso bajo la figura establecida en el Art. 650 del Código de Enjuiciamiento Civil, 32 LPRA sec. 3422. Pierde de vista que en realidad se trata de una ley especial que ha adoptado un recurso extraordinario como el medio idóneo para remediar violaciones de sus preceptos. Por tanto, cuando se invoca el *mandamus* bajo el Art. 20 de la Ley sobre Política Pública Ambiental, los principios rectores de la figura jurídica establecida en el Código de Enjuiciamiento **son aplicables solamente en tanto y en cuanto sean compatibles con la ley especial que lo ha adoptado como remedio**. Cabe señalar que, hasta que la Ley sobre Política Pública Ambiental fue enmendada en 1973, el *mandamus* era **el único** remedio disponible para que los ciudadanos particulares afectados requirieran el cumplimiento específico con los preceptos de la Ley sobre Política Pública Ambiental.[20] La Ley fue

---

[20] Al aprobarse la Ley en 1970, el Art. 19 (reenumerado Art. 20 en 1993) disponía:

> Cualquier **ciudadano** podrá llevar acciones en daños y perjuicios en los tribunales de justicia contra ciudadanos particulares basados en daños que sufran por violaciones a esta ley. Esta acción civil de daños y perjuicios es independiente y diferente de los procesos administrativos que se sigan en la Junta. Igualmente cualquier ciudadano afectado por la falta de implantación de esta ley, podrá acudir al Tribunal Superior **solamente** para solicitar un mandamus [sic], disponiéndose que lo anterior no incluye acciones de daños y perjuicios. (Énfasis suplido.)

Como podrá notarse, antes sólo los ciudadanos particulares podían llevar acciones en daños, y únicamente contra otros ciudadanos particulares. También se establecía al *mandamus* como remedio exclusivo para procurar el cumplimiento con la Ley. Mediante enmiendas se

enmendada varias veces con el propósito de ampliar, no para disminuir, tanto las acciones disponibles por incumplimiento, como la capacidad para incoarlas.

El Artículo 20 de la Ley sobre Política Pública Ambiental convierte al *mandamus* en una acción pública que permite a "cualquier persona natural o jurídica afectada" exigir al Estado el cumplimiento riguroso de su deber ministerial, constitucional y continuo, de conservar el ambiente y velar por el uso prudente de nuestros recursos. De esta forma, se facultó al ciudadano común, que es quien normalmente se ve directamente afectado por los problemas ambientales, con una forma simple de solicitar la observancia seria y escrupulosa de la política pública ambiental.

En Misión II reconocimos la procedencia del *mandamus* bajo la Ley sobre Política Pública Ambiental independientemente que existiese una "aprobación" por parte de la JCA de una DIA-P como DIA Final. En aquella ocasión señalamos que al amparo del Art. 20 de la Ley sobre Política Pública Ambiental, cualquier ciudadano con debido interés podía presentar tanto una acción en daños por la violación a la política pública ambiental, como un *mandamus* para que se cumpla con dicha política pública. Aclaramos que, **"la previa aprobación de una declaración de impacto ambiental no constituye necesariamente una defensa contra dichas acciones"**. Misión II, supra, a la pág. 1104. Al interpretar los remedios establecidos en la Ley sobre Política Pública Ambiental, resolvimos que éstos son "…tanto para **evitar** como para atender daños al medio ambiente no previstos en una declaración de impacto ambiental **o que resulten de una declaración que no fue preparada o aprobada de buena fe**." Id.

---

concedió capacidad a "toda persona natural o jurídica" para incoar las referidas acciones contra cualquier persona natural o jurídica. Además, se descartó el adjetivo "solamente" eliminando así la exclusividad del *mandamus* como remedio para solicitar implantación de la Ley de Política Pública Ambiental.

Ya en la presente Opinión hemos señalado la extensión de los deberes que imponen la Ley sobre Política Pública Ambiental y su reglamentación complementaria a una agencia proponente con relación a la preparación de una DIA. En cuanto a los referidos mandatos de estirpe constitucional, los funcionarios públicos carecen de discreción. Esto es, vienen obligados a cumplir con las disposiciones de la Ley sobre Política Pública Ambiental y la reglamentación complementaria para salvaguardar el mandato constitucional. Véase Misión II, supra.

Tampoco tenía discreción la ACT para hacer caso omiso a una dictamen final de este Tribunal que establecía la ley del caso. Nuestra Opinión claramente indicaba a la ACT que la construcción de la Ruta 66 era ilegal hasta tanto cumpliera con su deber ministerial de emitir una DIA Final para la totalidad de las fases de la Ruta 66 conforme a lo requerido por la Constitución, la Ley, el Reglamento y el informe del panel examinador aprobado por la JCA. Aun así, y en abierta contravención a lo dispuesto por este Tribunal, continuó construyendo sin producir una DIA Final adecuada.[21] La ACT ignoró las deficiencias señaladas y la JCA convalidó la inacción. La JCA no puede subsanar con tinta y papel los deberes ministeriales ignorados por la ACT.

El Tribunal de Circuito erró al interpretar que el *mandamus* instado por las Comunidades iba dirigido a revisar los méritos de la resolución emitida por la JCA. El *mandamus* sólo pretendía obligar a la ACT a dar cumplimiento a los deberes ministeriales indelegables que le impone el ordenamiento jurídico ambiental y que han sido reseñados en los incisos de esta Opinión. La ACT no tenía discreción para ignorar los requerimientos hechos por el panel examinador en el informe aprobado por la Junta de Gobierno de la JCA y reconocidos por este

---

[21] La JCA por su parte, abdicó su deber ministerial de fiscalizar el procedimiento de planificación ambiental de forma rigurosa y concienzuda, aprobando una resolución pro forma que intenta relevar a la ACT de sus obligaciones.

Tribunal.  **Sobre todo cuando en Colón Cortés I habíamos denunciado tanto la insuficiencia del suplemento, como lo contradictorio que resultaba el que la JCA avalara un proyecto segmentado**.  Procedió correctamente el Tribunal de Primera Instancia, Sala de San Juan, (Hon. Carmen Rita Vélez Borrás) al expedir el auto de *mandamus* para compeler a la ACT a emitir una DIA Final para la totalidad de las etapas proyectadas para la Ruta 66 cumpliendo cabalmente con los deberes ministeriales que le impone la legislación ambiental.

No podemos finalizar sin antes expresar la profunda preocupación que nos surge al examinar la escueta y deficiente evaluación ambiental preparada por la ACT en este caso luego de haber tenido bajo su consideración, por espacio de aproximadamente seis (6) años, los señalamientos de deficiencias de la JCA.  En concreto, nos preocupa la parquedad y ausencia de inventiva en la discusión de las alternativas a la Ruta 66.  El ordenamiento no exige que se contemple toda alternativa posible a una acción propuesta.  Sin embargo, la discusión de alternativas debe evidenciar que la agencia proponente dio seria consideración a soluciones alternas para el logro de sus objetivos.  Ante todo, a tenor con la sec. 5.3.7 del Reglamento, resulta imprescindible que la discusión de alternativas incluya un análisis comparativo del impacto ambiental de implantar cada alternativa.  Cabe destacar que la sec. 1502.14 del Reglamento de la CEQ tan citado por la ACT dispone sobre el análisis de alternativas: "[t]his section is **the heart** of the environmental impact statement…"  (Énfasis suplido.)

En el presente caso, la ACT tan solo analizó comparativamente y descartó las pocas alternativas estudiadas exclusivamente a base de un criterio de costo monetario.  Curiosamente, no se contemplaron soluciones innovadoras y de menor impacto ambiental para el problema de la congestión de tránsito que han sido implantadas exitosamente en otras vías del Área Metropolitana de San Juan, como lo son los cambios en la dirección del tráfico regulados por horario, los separadores de autopista móviles, la eliminación de semáforos mediante elevados o los

sistemas de transportación masiva.  En vez de utilizar la evaluación ambiental del proyecto para considerar si debía o no proseguirse con la propuesta, la ACT parece preparar una DIA para justificar la implantación de una decisión ya tomada.[22]  Decisión tomada hace más de treinta (30) años,[23] cuando aún no había despertado la conciencia ambiental, ni se perfilaba el desparrame urbano que sufrimos hoy día como resultado de una pobre planificación.

Una vez más aclaramos que:

"[…]al evaluar estos reclamos no intervenimos indebidamente con el funcionamiento de la Rama Ejecutiva.  No se pretende paralizar una obra, sino asegurar que se cumplan los requisitos estatutarios de estirpe constitucional, garantizar la conservación del ambiente y la salud de los ciudadanos afectados."  García Oyola v. J.C.A., res. el 21 de febrero de 1997, 142 D.P.R.___ (1997), 97 JTS 25, pág. 662.  Cuando el escrutinio de la JCA ha sido responsable e independiente y la agencia proponente ha cumplido cabalmente con sus deberes ministeriales, le hemos dado la merecida deferencia tanto a las determinaciones de la JCA, como a las actuaciones de la agencia proponente.  Véase Misión II, supra.

Por los fundamentos que anteceden, a tenor con la Sec. 4 del Art. V de la Constitución del Estado Libre Asociado de Puerto Rico y por estar conformes una mayoría absoluta del Tribunal, el Juez Presidente señor  Andréu García, la Juez Asociada señora Naveira de Rodón y los Jueces Asociados señores Hernández Denton y Fuster Berlingeri, se declara la inconstitucionalidad de la Sec. 1 de la Ley Núm. 324 de 6 de noviembre de 1999, según se aplica a los hechos de

---

[22]  Véase la Sec. 1502.5 la cual exige la pronta preparación del documento ambiental para que pueda servir en el proceso de tomar decisiones, no para justificarlas.  La referida sección dispone al respecto:  "[t]he statement shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made."  (Énfasis suplido.)

[23]  Véase, el escolio 10.

este caso; ello por haber sido aprobada en violación al principio de separación de poderes.

Además, por estar conformes una mayoría de los jueces, el Juez Presidente señor Andréu García, la Juez Asociada señora Naveira de Rodón y los Jueces Asociados señores Hernández Denton y Fuster Berlingeri, se revoca la sentencia dictada por el Tribunal de Circuito de Apelaciones, Circuito Regional de San Juan y se confirma la sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, concediendo el auto de *mandamus* y el entredicho permanente contra la ACT y su presidente.

El Juez Asociado señor Fuster Berlingeri emitió Opinión de conformidad en cuanto a los acápites I y II de la Opinión, concurrente en cuanto al resto del resultado ordenado por la mayoría y disidente en torno a aspectos importantes de lo dictaminado en el acápite III. El Juez Asociado señor Corrada del Río disiente con opinión escrita. El Juez Asociado señor Rebollo López disiente sin opinión escrita. El Juez Asociado señor Negrón García se encuentra inhibido.


Se dictará sentencia de conformidad.


MIRIAM NAVEIRA DE RODÓN
Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wanda Colón Cortés, por sí y
como representante de las
Comunidades Opuestas a la
Ruta 66

    Peticionarios

       v.                            CC-1999-666

Carlos I. Pesquera, Presidente
de la Autoridad de Carreteras
y Transportación

    Recurridos

SENTENCIA

San Juan, Puerto Rico a 19 de abril de 2000

Por los fundamentos expuestos en la Opinión que antecede, a tenor con la Sec. 4 del Art. V de la Constitución del Estado Libre Asociado de Puerto Rico y por estar conformes una mayoría absoluta del Tribunal, el Juez Presidente señor Andréu García, la Juez Asociada señora Naveira de Rodón y los Jueces Asociados señores Hernández Denton y Fuster Berlingeri, se declara la inconstitucionalidad de la Sec. 1 de la Ley Núm. 324 de 6 de noviembre de 1999, según se aplica a los hechos de este caso; ello por haber sido aprobada en violación al principio de separación de poderes.

Además, por estar conformes una mayoría de los jueces, el Juez Presidente señor Andréu García, la Juez Asociada señora Naveira de Rodón y los Jueces Asociados señores Hernández Denton y Fuster Berlingeri, se revoca la sentencia dictada por el Tribunal de Circuito de Apelaciones, Circuito Regional de San Juan y se confirma la sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, concediendo el auto de *mandamus* y el entredicho permanente contra la ACT y su presidente.

Lo pronuncio, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri emitió opinión de conformidad en cuanto a los acápites I y II de la Opinión, concurrente en cuanto al resto del resultado ordenado por la mayoría y disidente en torno a aspectos importantes de lo dictaminado en el acápite III. El Juez Asociado señor Corrada del Río disiente con opinión escrita. El Juez Asociado señor Rebollo López disiente sin opinión escrita. El Juez Asociado señor Negrón García se encuentra inhibido.


Isabel Llompart Zeno
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wanda Colón Cortés, por sí
y como representante de las
Comunidades Opuestas a la
Ruta 66

    Peticionarios

            vs.                  CC-1999-666       Certiorari

Carlos I. Pesquera, Presidente
de la Autoridad de Carreteras
y Transportación

    Recurrido

Opinión de Conformidad en parte, Disidente en parte y Concurrente en parte, emitida por el Juez Asociado señor FUSTER BERLINGERI.

San Juan, Puerto Rico, a 19 de abril de 2000.

I

Estoy **conforme** con lo señalado y dispuesto por una pluralidad del Tribunal en los acápites I y II de su opinión. Por tanto, me uno a ellos para así integrar una mayoría de este Foro en cuanto a declarar la inconstitucionalidad de la Sec. 1 de la Ley Núm. 324 de 6 de noviembre de 1999 en su aplicación a los hechos del caso de autos.

**Concurro**, además, con la otra parte del resultado que ordena la pluralidad del Tribunal en este caso, pero lo hago por fundamentos distintos a los de ésta. En efecto, **disiento** de aspectos importantes de lo que esa pluralidad expresa en el acápite III de su opinión, por lo que dicho acápite

III, contrario a los acápites I y II, no constituye una opinión del Tribunal ni sienta precedente, sino sólo el parecer de la pluralidad de los Jueces que la suscriben.

Veamos precisamente en qué diferimos la pluralidad del Tribunal y yo con respecto a lo expuesto en el acápite III de su opinión.

II

No cabe duda de que en el caso de autos la Junta de Calidad Ambiental (JCA) no cumplió con su responsabilidad jurídica al "aprobar" **proforma** el 14 de junio de 1999 la supuesta Declaración de Impacto Ambiental Final (DIA Final) del proyecto particular que ha dado lugar a este pleito. La JCA tomó la decisión referida sin que la agencia proponente, la Autoridad de Carreteras y Transportación (ACT), hubiese realizado las medidas necesarias para corregir las deficiencias en el proyecto referido que le fueron señaladas por este Tribunal en Colón Cortés v. J.C.A., Opinión de 2 de junio de 1999, 148 D.P.R. ___, 99 JTS 91. Como bien señala la pluralidad de Jueces en su opinión, la JCA no podía subsanar sólo con tinta y papel las deficiencias en el proyecto que la ACT no había corregido, todo ello en clara desatención de lo resuelto por este Foro en Colón Cortés v. J.C.A., supra.

Frente al incuestionable incumplimiento por la JCA aquí del medular y exclusivo deber fiscalizador que le reconocimos en Misión Industrial v. J.C.A., Opinión de 29 de junio de 1998, 145 D.P.R. ___, 98 JTS 77, procedía que los peticionarios acudiesen al Tribunal de Circuito de Apelaciones a impugnar la referida actuación de la JCA. La errónea decisión de la JCA "aprobando" proforma la DIA Final del proyecto aludido no era una mera recomendación como supone la pluralidad de Jueces de este Tribunal en su opinión al resolver que dicha decisión no tenía carácter adjudicativo. Dicha postura de la pluralidad atenta contra el rol esencial que juega la JCA en el proceso de confeccionar una DIA Final adecuada, y por ello, no puedo suscribirla. Disiento de tal parecer.

Ahora bien, el hecho de que los peticionarios no utilizaron el remedio apropiado de acudir en revisión judicial ante el Tribunal de Circuito de Apelaciones para impugnar la errónea decisión de la JCA, no significa que fuese improcedente la petición de **mandamus** que éstos presentaron ante el Tribunal de Primera Instancia el 16 de junio de 1999. En situaciones como la de autos, en la cual la agencia proponente también ha incumplido sus propios deberes ministeriales y ha actuado al margen de la responsabilidad que le fija la Ley sobre Política Pública Ambiental, procede el recurso de mandamus para obligar a dicha agencia proponente a observar el mandato de esa Ley. Misión Industrial v J.C.A., supra.

En el caso de autos, la ACT hizo caso omiso de la mayor parte de los señalamientos que le hicimos en Colón Cortés v. J.C.A., supra, con respecto al proyecto en cuestión. En efecto, la ACT procuró ante la JCA la aprobación de la DIA Final de dicho proyecto sin haber corregido adecuadamente las deficiencias sustantivas que habíamos identificado antes. La aprobación de la DIA Final por la JCA no inmunizó a la ACT de cumplir con sus propios deberes bajo la Ley sobre Política Pública Ambiental. Por ello, procedía el mandamus referido.

En otras palabras, en la situación que tenemos ante nos en el caso de autos, tanto la JCA como la ACT tenían pendientes deberes importantes que cumplir. Se trata precisamente del esquema de **doble garantía** que ofrece la Ley de Política Pública Ambiental para implantar el mandato constitucional sobre la conservación de los recursos naturales, que reconocimos en Misión Industrial v. J.C.A., supra. Como **ambas**, la JCA y la ACT, tenían deberes que cumplir y no lo hicieron, existían **dos remedios** distintos que los proponentes podían utilizar para procurar que dichas entidades actuasen conforme a lo que requiere la Ley de Política Pública Ambiental. El hecho de que los peticionarios no procuraron uno de los dos remedios no les impedía utilizar el otro.

III

Lo anterior me trae ante la cuestión de cuál es el deber ministerial de la ACT con respecto al cual procede el mandamus incoado por los peticionarios.

Como bien señala la pluralidad de Jueces en su opinión, desde sus comienzos la ACT ha procurado lograr una DIA Final para un proyecto vial que persigue unir los pueblos del este de Puerto Rico con el Area Metropolitana de San Juan. Se trata de **un solo proyecto, que incluye varios tramos**. La ACT, luego de concebir el proyecto como una unidad, ahora interesa dejar en suspenso todo lo relativo a los tramos de Río Piedras a Carolina y de Canóvanas a Río Grande de dicho proyecto, para adelantar así la evaluación ambiental del proyecto. El súbito cambio en los planes de la ACT ciertamente permite el juicio de la pluralidad de Jueces del Tribunal de que dicho cambio constituye una fragmentación ilegal del proyecto aludido que sólo persigue evadir el escrutinio ambiental cumulativo de éste. Es con respecto a esta actuación evasiva de la ACT que procede el mandamus. Hasta aquí concurro con el resultado que ordena la pluralidad en el caso de autos. Si la ACT insiste en continuar con el proyecto original aunque dividido en fases, procede el mandamus referido.

Sin embargo, nada de lo anterior debe impedir que la ACT pueda proponer un nuevo proyecto vial sólo entre Carolina y Canóvanas si tal proyecto puede realizarse sin problemas ambientales. El hecho de que el proyecto abarcador que la ACT ha visualizado desde un principio no cuente con una DIA Final adecuada, no puede impedir que dicha agencia **proponga en su lugar** un proyecto nuevo de menor alcance que sea viable desde el punto de vista ambiental. En efecto, el tramo ya propuesto por la ACT entre Carolina y Canóvanas en el proyecto en cuestión, si es debidamente presentado como un nuevo proyecto, sin pretensiones ulteriores, no debe encarar problemas para que se emita una DIA Final. **No le corresponde a este Foro decidir sobre la longitud de las carreteras en Puerto Rico**. **No es asunto nuestro si la ruta así acortada es deseable o no, o si tiene lógica realizarla**. No le compete a este Tribunal imponer soluciones a los

problemas del tránsito, por innovadoras que nos parezcan. Nuestra responsabilidad se limita a asegurar que se cumpla con la política pública ambiental del país, que es de origen constitucional.


JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Wanda Colón Cortés, por sí y
como representante de las
Comunidades Opuestas a la

**Ruta 66**

Peticionarios

        v.

                        CC-1999-666

Carlos I. Pesquera, Presidente
de la Autoridad de Carreteras y
Transportación

      Recurridos

Opinión disidente emitida por el Juez Asociado SEÑOR CORRADA DEL RÍO

San Juan, Puerto Rico a 19 de abril de 2000.

Disiento de la Opinión de la mayoría en este caso por tres razones fundamentales, que discutimos más adelante, a saber: (i) es totalmente improcedente el recurso de *mandamus* luego que con posterioridad a nuestro dictamen en *Colón Cortés v. Autoridad de Carreteras*, res. el 2 de junio de 1999, 99 T.S.P.R. 85, 99 J.T.S. 91, la Junta de Calidad Ambiental (JCA) emitiera una Determinación de Impacto Ambiental final (DIA final) para el segmento de la Ruta 66 entre Carolina y Canóvanas, ya que de existir alguna inconformidad por parte de los peticionarios con dicha determinación, el remedio apropiado era acudir en revisión judicial ante el Tribunal de

Circuito de Apelaciones, (ii) no es necesario pasar sobre la cuestión de la constitucionalidad de la sección 1 de la Ley Núm. 324 de 6 de noviembre de 1999 para resolver este caso y, además, como cuestión de derecho, la referida disposición es constitucionalmente válida, por lo que este Tribunal viola los principios de separación de poderes al intervenir arbitrariamente con los poderes de las otras ramas de gobierno y, (iii) aplicando las normas establecidas sobre la segmentación de proyectos, el tramo de la Ruta 66 entre Carolina y Canóvanas, que es el que se encuentra en construcción y hemos paralizado, es un proyecto que se justifica por sí solo y la DIA final emitida por la JCA atiende adecuadamente su impacto ambiental. La intervención sustantiva que hace la mayoría a través de la opinión, sin tener jurisdicción para ello, se contrapone al orden jurídico que permea nuestro ordenamiento e invade las prerrogativas de las otras ramas de gobierno. ¿Las víctimas reales? Los miles y miles de ciudadanos que verán prolongada su espera y pérdida de tiempo en la congestionada PR-3 en su tránsito diario entre Carolina y Canóvanas y el pueblo de Puerto Rico por los millones de dólares en costos adicionales que la paralización del proyecto de la Ruta 66 conlleva, así como los costos adicionales en que se incurrirá si el proyecto finalmente se construye luego que se completen los trámites administrativos y judiciales pertinentes. Si la mayoría cree que con esta decisión protege el ambiente, que bajen del Olimpo para que vean las excavaciones abiertas en el tramo bajo construcción, que paralizamos luego de habernos negado a hacerlo en varias ocasiones; por otra parte, si en el futuro se fueran a construir otros tramos de la Ruta 66 de mayor sensitividad ambiental, podremos entonces escudriñar el cumplimiento de las leyes que protegen el ambiente para esas etapas, que ahora yacen inertes en las gavetas de la Autoridad de Carreteras y Transportación (ACT).

I

Es de todos sabido que el presente caso se suscita como secuela de la sentencia emitida por este Tribunal en el caso de *Colón Cortés* v. *Autoridad de Carreteras*, *supra*. En aquella ocasión, nuestra decisión se basó en el hecho de que no existía una declaración de impacto ambiental final, la cual pudiera ser sujeto de revisión judicial. En ese contexto fue que expresamos: "Ante esta circunstancia los recurridos no están faltos de remedio. Para hacer valer la obligación de la ACT en este caso tienen disponibles el recurso de *mandamus*, según establece el artículo 20 de la Ley Sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1139 (1997), (en adelante "LPPA") y el recurso de *injunction*." *Id.*

De conformidad con nuestra decisión en *Colón Cortés I*, *supra*, los peticionarios presentaron ante el Tribunal de Primera Instancia un recurso de *mandamus* alegando que el proyecto no

estaba debidamente autorizado, por lo cual solicitaron al tribunal que ordenase a los recurridos a cumplir con su deber y cesar de continuar la construcción hasta tanto se emitiera una DIA final debidamente aprobada por la JCA, de conformidad con lo dispuesto por este Tribunal en su sentencia de 2 de junio de 1999.

A tenor de lo anterior, los recurridos comparecieron ante el tribunal de instancia a informar que la Junta había emitido una resolución autorizando la DIA final para el proyecto de la Ruta 66. Plantearon que en virtud de tal resolución, la petición de *mandamus* presentada por los peticionarios ante el tribunal de instancia se había tornado académica ya que se había cumplido con el requisito impuesto por este Tribunal de obtener una DIA final. Por lo tanto, el propósito del *mandamus* ya se había cumplido.

Para dilucidar claramente el asunto es menester definir la figura del *mandamus* y sus requisitos. Veamos.

A.   II

El *mandamus* establecido en la LPPA está disponible para cualquier persona natural o jurídica afectada por la falta de implementación de esa ley. En ella no se regula la naturaleza del *mandamus*, por lo cual éste se rige por los principios generales establecidos en los artículos 649 al 661 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 3421-3433. El artículo 650 establece que el auto de *mandamus* podrá dictarse por los tribunales para obligar a cualquier persona, corporación, junta o tribunal de inferior categoría, a cumplir un acto que la ley particularmente ordene como un deber resultante de un empleo, cargo o función pública.

Por ello, el recurso de *mandamus* se caracteriza por ser un remedio **extraordinario**, que no podrá dictarse en los casos en

que se encuentre un recurso adecuado y eficaz en el curso ordinario de la ley. 32 L.P.R.A. sec. 3423.

Anteriormente, este Tribunal reconoció que el auto de *mandamus* era un recurso apropiado para que los tribunales de primera instancia pasaran juicio sobre decisiones cuasi judiciales emitidas por agencias administrativas. *Cerame Vivas* v. *Secretario de Salud*, 99 D.P.R. 45 (1970). No obstante, al aprobarse la Ley de Procedimientos Administrativos Uniforme, 3 L.P.R.A. sec. 2172, se estableció un procedimiento ordinario para la revisión de las decisiones finales de las agencias administrativas.

En el caso de marras, nadie impugna el hecho de que en ausencia de una DIA final, los peticionarios no estaban faltos de remedios y tenían derecho a incoar una petición de *mandamus*, como señalamos en *Colón Cortés I, supra.* No obstante, una vez la Junta emitió resolución aprobando una DIA final para el proyecto de la Ruta 66, el auto de *mandamus* dejó de ser el recurso apropiado para solicitar que los recurridos cumplieran con su deber de obtener una DIA final. Por lo tanto, una vez el tribunal de instancia advino en conocimiento de que la Junta había emitido la antedicha resolución, éste perdió jurisdicción sobre el auto de *mandamus*, y los peticionarios tenían que utilizar el remedio de la revisión judicial para determinar la validez de la resolución. Ello debido a que los deberes ministeriales fueron descargados por la Junta y por los recurridos al haberse acogido la DIA preliminar como DIA final, según lo permite la sección 5.5.6.1 del Reglamento. Así, ya el *mandamus*, cuyo propósito era que los recurridos cumplieran con sus deberes ministeriales, pasó a ser un remedio no idóneo.

La resolución emitida por la Junta es inatacable como cuestión de derecho mediante el auto de *mandamus*. La misma, una vez emitida por la agencia correspondiente, goza de una

presunción de legalidad y corrección, y así lo reitera la mayoría. No obstante, entiende la mayoría que esto no significa que "vayamos a aceptar ciegamente y sin el análisis correspondiente cualquier resolución emitida por la JCA sobre el asunto."[24] En esto radica el craso error que comete en el día de hoy este Tribunal. En intervenir, a través de un recurso extraordinario, en la supuesta incorrección o ilegalidad de una resolución final emitida por una agencia administrativa. Luego de estas expresiones, y entrando en una grave contradicción, la opinión mayoritaria expresa que "no resulta ni prudente, ni necesario entrar en los méritos específicos de la Resolución 99-21-1 de la JCA";[25] y para empeorar la situación concluye que "aún si presumiéramos la validez y corrección de la resolución aprobatoria emitida por la JCA en torno a la ruta acortada, la ACT no ha cumplido aún con el deber ministerial de producir una DIA Final **para la totalidad de las etapas** de la Ruta 66."[26]

A *contrario sensu,* la mayoría se ampara en que la resolución aprobando la DIA preliminar como DIA final, no puede relevar a la agencia proponente de satisfacer los requisitos que establece la LPPA, *supra.* Incide la mayoría al interpretar que el auto de *mandamus* es el método apropiado para que los recurridos cumplieran con los requisitos establecidos en la LPPA, aún cuando ya existía una DIA final. La mayoría ignora el propósito extraordinario del *mandamus*, el cual, como expresáramos anteriormente, solamente se utilizará en situaciones en que no esté disponible un recurso ordinario.

El *mandamus* en este caso fue correctamente interpuesto ante el tribunal de instancia, ya que los recurridos no contaban con una DIA final. En esa etapa, la figura de *mandamus* dispuesta en

---

[24] Opinión del Tribunal, a la pág. 52.
[25] Opinión del Tribunal, a la pág. 55.

[26] *Id.*

la LPPA era el único remedio disponible para los peticionarios. Es para esas etapas preliminares para las cuales la LPPA provee dicho remedio. Luego de que existe una resolución aprobando una DIA final, el *mandamus* deja de ser un remedio disponible, y entran en juego los recursos ordinarios procedentes en derecho.

El principal problema que causa la postura de la mayoría, es que siempre quedará al arbitrio de los opositores de un proyecto interponer un *mandamus* cuando entiendan que por alguna razón inimaginable, los proponentes del proyecto no cumplieron con la LPPA. No importa cuál sea su posición, ni el hecho de que se haya aprobado una DIA final, el oponente siempre tendrá a su disposición la figura del *mandamus*. Nada más lejos de la correcta interpretación del auto de *mandamus* y de su carácter extraordinario. Este Tribunal, con su decisión en el día de hoy, autoriza lo que claramente constituye un abuso del derecho.

B.   <u>III</u>

Es norma jurisprudencial de autolimitación judicial, que no se considerará el aspecto constitucional de una ley cuando puede resolverse un asunto mediante un análisis estatutario. *P.P.D.* v. *Administrador General de Elecciones,* 111 D.P.R. 199, 243 (1981); *Pachecho* v. *Srio. Instrucción Pública*, 108 D.P.R. 592, 601 (1979). Consideramos que era innecesario juzgar la constitucionalidad de las disposiciones impugnadas, por existir un fundamento alterno que permitía disponer del caso. *Díaz Aponte* v. *Comunidad San José, Inc.*, 130 D.P.R. 782 (1992). En esos casos reiteramos el principio elemental de interpretación estatutaria de que cuando la validez de una ley está en entredicho, y existen dos posibles interpretaciones, una de las cuales sería inconstitucional, los tribunales debemos adoptar la interpretación que sostendría su validez constitucional.

En el presente caso la mayoría se desvía de la única controversia real ante nos. Luego de una excesiva discusión

sobre la separación de poderes, la opinión del Tribunal concluye que no entrará a discutir la constitucionalidad de las Leyes Núm. 323 y Núm. 324, y que sólo declara inconstitucional, en su aplicación a este caso, la sección 1 de la Ley Núm. 324, referente a la segmentación de un proyecto.[27] No podemos concurrir con tal conclusión.

La actuación legislativa de aprobar una ley que permite la segmentación de un proyecto se da dentro del marco de sus prerrogativas constitucionales y no viola el principio de la separación de poderes. Dicha legislación no intenta hacer determinaciones de hecho ni dictar conclusiones de derecho particulares, para la resolución en los méritos del caso de marras. Es decir, la legislación no ha pretendido adjudicar los méritos de la controversia ante nuestra consideración.[28]

En *Robertson* v. *Seattle,* 503 U.S. 429, 441 (1992)*,* el Tribunal Supremo federal, decidió que cuando una enmienda legislativa no pretende hacer determinaciones de hecho ni dictar conclusiones de derecho particulares en relación a un caso pendiente ante los tribunales, dicha legislación no viola la separación de poderes.

Así también, en *Plaut* v. *Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995)*,* el Supremo federal afirmó lo resuelto en

---

[27] Ley Núm. 324 de 6 de noviembre de 1999, sección 1:

En aquellos casos donde el Gobierno de Puerto Rico adopte planes a largo plazo de desarrollo de infraestructura pública, en particular, pero no limitado únicamente a los proyectos de transportación contemplados en los planes viales de la Junta de Planificación, se reconoce que los proyectos asociados a dichos planes pueden llevarse a cabo por etapas, según la política pública y los recursos lo permitan. Las agencias e instrumentalidades del Gobierno de Puerto Rico deberán someter las declaraciones de impacto ambiental, cuando correspondan, antes de proceder a la construcción de cualquiera de dichas etapas.

[....]

*Robertson, supra,* en relación a que no se viola la separación de poderes cuando la legislatura, mediante enmienda a una legislación, afecta el derecho aplicable a un caso pendiente ante los tribunales. Allí dicho tribunal expresó:

> [I]n *United States* v. *Klein*...we refused to give effect to a statute that was said "[to] prescribe rules of decision to the Judicial Department of the government in cases pending before it."... Whatever the precise scope of *Klein*, however, later decisions have made clear that its prohibition does not take hold when Congress "amend[s] applicable law." (Citas omitidas.) *Id.*

Inclusive resolvió que: "[w]hen a new law makes clear that it is retroactive, an appelate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly". *Id.* a la pág. 226.

Aplicando dicha doctrina al presente caso, este Tribunal debió resolver a la luz de la nueva legislación, debido a que no estamos ni siquiera ante una ley que cambió el derecho aplicable a la controversia ante nos, ya que nunca estuvo ante nosotros el asunto específico de la segmentación del proyecto de la PR-66.

A tenor, reafirmamos lo resuelto en *Misión Industrial, supra*, a los efectos de que el poder legislativo no puede dictarle normas al poder judicial en un caso pendiente sin que medie una enmienda al derecho aplicable.[29] Por el contrario, la legislatura puede afectar litigios pendientes sin contravenir el principio de separación de poderes, "siempre que lo haga en el marco de la enunciación de una nueva norma de derecho y no meramente de la adjudicación de una controversia específica." *Misión Industrial, supra*. Esto fue lo que resolvimos, y este es

---

[28] *Véase: Misión Industrial* v. *Junta de Planificación*, res. el 30 de junio de 1998, 98 T.S.P.R. 86, 98 J.T.S. 79.

[29] *Véase: Plaut* v. *Spendthrift Farm, Inc., supra.*

el alcance de nuestras expresiones en dicho caso, a pesar de que

la mayoría arbitrariamente se niegue hoy a aceptarlo y aplicarlo

al presente caso.

C.

D.  **IV**

En cuanto a los méritos de la segmentación tenemos, asimismo, que disentir de la opinión del Tribunal, ya que la misma es plausible.

Según surge del expediente ante nos, el proyecto de la Ruta 66 se diseñó al amparo de un Plan Vial, el cual tenía el propósito de definir y reservar las franjas de terreno que fueran necesarias para el futuro desarrollo de elementos esenciales de la infraestructura de transportación. Se identificó la necesidad de hacer viable para el futuro, una autopista entre Canóvanas y Río Grande, la cual no estaba en el Plan Vial. Para lograr viabilizar esa vía, urgía el reservar esa franja de terreno, pues todo el corredor entre las dos ciudades mencionadas estaba siendo objeto de rápido desarrollo. De otra parte, el Plan Vial no contempla una extensión de la PR-66 más allá de Río Grande, ni hay aprobada o solicitada semejante extensión.

Originalmente el Plan Vial incluía el proyecto de la Ruta 66, extendiéndose desde Río Piedras hasta el oeste de Canóvanas. No obstante, el Plan de 1982, recomienda extender más hacia el este la PR-66, para llevarla hasta la intersección de las carreteras PR-3 y PR-188, al este de Canóvanas. Según estudios realizados por la ACT, este segmento tiene utilidad por sí mismo, y facilitaría el acceso de los habitantes del área metropolitana al Bosque Nacional, a Luquillo y a otras áreas recreativas del área este de la isla.

Nuestra legislación ambiental procede de la National Environmental Policy Act (NEPA), 42 U.S.C. sec. 4321, *et seq.*, y nuestros reglamentos fueron redactados de forma similar al Reglamento del Consejo de Calidad Ambiental federal.[30] A tenor, esta legislación y sus interpretaciones son de gran valor persuasivo, y así lo hemos reiterado.

La segmentación es una doctrina amparada en la NEPA, la cual resulta impropia cuando una agencia ha dividido un proyecto en varios sub-proyectos con el propósito de crear una impresión engañosa de su impacto ambiental.[31]

En el presente caso, el hecho de no haber evaluado los impactos ambientales de la posible extensión de la PR-66 de Canóvanas a Río Grande, no constituye un pretexto para no realizar una evaluación ambiental total. Este es un plan aplazado indefinidamente. Si la ACT decidiera en un futuro construir el antedicho segmento —lo cual no se contempla en este momento— éste será sujeto de la evaluación ambiental correspondiente.

El análisis que debió seguir la mayoría del Tribunal, era el de determinar si la segmentación resulta impropia a la luz de los criterios seguidos por la jurisprudencia federal, a

---

[30] Council on Environmental Quality Regulations, 40 C.F.R. secs. 1500-1517.

[31] *Preserve Endangered Areas of Cobb's History* v. *U.S. Army Corp,* 87 F.3rd 1242, 1247 (1996).

saber: si el segmento no tiene términos lógicos; si no tiene utilidad independiente y; si elimina la posibilidad de considerar alternativas.[32]

El caso de marras presenta una ruta que definitivamente tiene términos lógicos, es completamente útil por sí misma y no elimina la posibilidad de considerar alternativas. Es indudable que el segmento actualmente en construcción -de Carolina a Canóvanas- y que arbitrariamente hemos paralizado, proveerá una mejoría sustancial y significativa al movimiento de vehículos en el área de más congestión de tránsito de Puerto Rico. Esto se encuentra avalado por la DIA final aprobada por la Junta. De ese documento surge que dicho segmento mejorará dramáticamente la congestión y el tiempo de tránsito en la PR-3. En específico, la región que conduce de Carolina a Canóvanas es la que presenta mayor congestión.

La PR-66, actualmente paralizada sin justificación, atraerá cerca de cincuenta y cinco mil novecientos (55,900) vehículos por día, aumentándose la velocidad operacional entre Carolina y Canóvanas de unas quince (15) millas por hora a unas cincuenta (50) millas por hora.[33]

---

[32] *Village of Los Ranchos de Albuquerque* v. *Barnhart,* 906 F.2d 1477, 1483 (1990).

[33] Resolución de la Junta, Apéndice, pág. 60.

Estos datos, que surgen de la DIA final aprobada por la Junta, establecen, luego de un análisis objetivo y desapasionado, los términos lógicos y la utilidad independiente del segmento de Carolina a Canóvanas.

La opinión del Tribunal se aleja del análisis seguido por muchas jurisdicciones federales al interpretar la NEPA y sus reglamentos. Al así actuar, este Tribunal inexplicablemente se abstrae de las decisiones de la jurisdicción de donde proceden nuestras leyes ambientales, que para nosotros son altamente persuasivas.

La mayoría no presenta fundamento alguno que le apoye al prescindir de un análisis objetivo del proyecto de la Ruta 66 ante nuestra consideración – el segmento entre Carolina a Canóvanas. Así, razona que el tramo en cuestión no tiene términos lógicos por entender que conectar dos municipios en Puerto Rico es ilógico; que no provee una vía alterna que reduzca el tráfico en la vía de la PR-3; y que siendo así, definitivamente la ACT tendrá que construir otros tramos. No hace falta un análisis profundo de dichos argumentos para darse cuenta que la mayoría sólo actúa guiada por meras especulaciones.

**E. V**

En resumen, la mayoría erró al concluir que este Tribunal podía entender en el presente recurso, a pesar de que el auto de *mandamus* no era el recurso dispuesto en ley para así hacerlo. La intervención sustantiva que hace la mayoría a través de toda la opinión, sin tener jurisdicción para ello, se contrapone al orden jurídico que permea nuestro ordenamiento e invade las prerrogativas de las otras ramas de gobierno.

Por tales motivos disentimos de la opinión mayoritaria de este Tribunal. Por el contrario, confirmaríamos el dictamen del Tribunal de Circuito de Apelaciones.

BALTASAR CORRADA DEL RÍO
Juez Asociado

CC-1999-666